698 So.2d 555 (1997)
Dexter MITCHELL, Appellant,
v.
STATE of Florida, Appellee.
No. 95-02169.
District Court of Appeal of Florida, Second District.
July 11, 1997.
*556 James Marion Moorman, Public Defender, Bartow, and Kathleen Calcutt, Assistant Public Defender, Clearwater, for Appellant.
Robert A. Butterworth, Attorney General Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Judge.
Dexter Mitchell appeals numerous convictions and sentences arising from an unusual sequence of events that occurred on October 26, 1994. During this rampage, he carried a BB pistol. He struck his estranged wife on the head with the pistol and threatened to shoot several other people. The state failed to introduce testimony that the BB pistol was operable or loaded at any time during this episode. The gun was empty when introduced into evidence and there is no testimony that a law enforcement officer ever emptied BBs from its reservoir. We conclude the evidence was sufficient to prove a prima facie case of aggravated battery with a deadly weapon. With some hesitation, we conclude that the evidence also establishes trespass with a dangerous weapon, robbery with a deadly weapon, and aggravated assault *557 with a deadly weapon. When a defendant's words or actions imply that a device is dangerous or deadly, and the device is normally dangerous or deadly when used in its ordinary and usual manner, but at the time of the offense it is not dangerous or deadly due to a condition that cannot be observed by the victim, we conclude that a jury may find the device to be a dangerous or deadly weapon. Accordingly, we affirm the trial court in all respects.
We certify to the Supreme Court of Florida the following question of great public importance:
IF THE STATE FAILS TO PROVE THAT A BB PISTOL IS LOADED AND OPERABLE AT THE TIME OF AN OFFENSE, CAN IT BE CLASSIFIED AS A DANGEROUS OR DEADLY WEAPON WHEN THE DEFENDANT'S ACTIONS CAUSE THE VICTIM TO REASONABLY BELIEVE THAT THE BB PISTOL IS LOADED AND OPERABLE?

I. THE EVENTS
On October 26, 1994, while armed with a BB pistol that appeared to be a firearm, Mr. Mitchell went to the home of his estranged wife. Another man was at the house. Mr. Mitchell entered the house without permission. He pulled the BB pistol from his jacket and threatened to kill both his wife and her friend. He took money from his wife and attempted to take money from the man.
Mr. Mitchell's wife escaped and ran down the street. Mr. Mitchell chased her, BB pistol in hand, threatening to shoot her. She entered a chiropractor's office for protection. He followed her into the office. Inside the office, he threatened several people with the gun, and struck his wife on the head repeatedly with the butt of the gun. She sustained lacerations that required medical treatment.
Mr. Mitchell then fled to a mobile home park and entered the home of an elderly couple without their permission. He claimed he was a police officer and actually allowed them to handle the BB pistol. The evidence does not suggest that he threatened the couple with the gun. Instead, the record reveals that during the course of the trespass, he pointed the gun at himself and announced he was going to kill himself. The couple fled the mobile home as the police were arriving. After a short standoff, Mr. Mitchell threw his BB pistol from the mobile home and surrendered.

II. THE CONVICTIONS AND SENTENCES
The state charged Mr. Mitchell with fourteen offenses. At the conclusion of his trial, the jury convicted him of eleven offenses. For the events at the home of his wife, he was convicted of robbery of his wife with a deadly weapon and attempted robbery of her friend with a deadly weapon. For the events at the chiropractic office, he was convicted of trespass with a dangerous weapon, aggravated battery upon his wife with a deadly weapon, two counts of aggravated assault with a deadly weapon, and four counts of simple assault. For the events at the mobile home, he was convicted of trespass with a dangerous weapon. In total, the jury convicted Mr. Mitchell of four misdemeanors and seven felonies. The trial court imposed concurrent sentences, the longest of which is thirteen years' incarceration. We affirm the four simple assault convictions without discussion. We discuss only the issues relating to the BB pistol.

III. THE EVIDENCE CONCERNING THE BB PISTOL
The evidence concerning the BB gun is somewhat atypical. The gun was identified for introduction into evidence by Mr. Mitchell's wife. She testified that the pistol appeared to be the weapon used to threaten her and to beat her over the head. A police officer testified that the police collected the gun as evidence at the mobile home park and stored it in an evidence locker. No one testified that the gun was loaded and operable at the scene. No technician fired the weapon or testified to its power.
Because this court thought it possible that the gun, when introduced into evidence, might still have had BBs in its reservoir, we requested the actual pistol be included in our record. Even on careful examination, it *558 looks like a black, .22 caliber semi-automatic pistol. It is a Huntington Marksman Repeater BB Pistol, which is powered by a spring, rather than a CO2 cartridge.[1] It has a reservoir to hold BBs. Upon physical examination, there is no evidence that it is loaded. It was taped by the police to render it inoperable, but no officer testified about taping the gun. If it was unloaded by the police when they taped it, that fact is not established in the record. We recognize the possibility that Mr. Mitchell may have emptied the BB gun before he threw it out of the mobile home. However, the record contains no evidence of BBs located in the mobile home or on his person. There is no evidence that he ever fired the gun during this extended criminal episode.
Various witnesses testified that they thought the BB gun was a real firearm. Mr. Mitchell carried and used the weapon as if it were loaded. During his own testimony after his motion for judgment of acquittal had been denied, Mr. Mitchell called the BB pistol a "weapon" or "gun." He never testified that the gun was empty or inoperable. He explained that he had been in the military and handled this weapon as he had been trained to use firearms in the military.

IV. AGGRAVATED BATTERY WITH A DEADLY WEAPON
Mr. Mitchell was charged with aggravated battery for striking his wife with the pistol and causing two gashes on both sides of her head. Section 784.045(1)(a), Florida Statutes (1993), allows the state to charge aggravated battery either for use of a "deadly weapon" or for intentionally causing a "permanent disability." The state included both theories in the information and in the jury instructions. The evidence established that Mr. Mitchell used the pistol as a bludgeon and created gashes on his wife's head. Even if the pistol had been a toy gun, his intentional use of this metal object to attack his wife supported a conviction for aggravated battery. Gomez v. State, 496 So.2d 982 (Fla.App.1986). Accordingly, we affirm this conviction.

V. THE BB GUN IS NOT A FIREARM
Part of the difficulty in this and similar cases stems from the statutory definition of a "firearm." Section 790.001(6), Florida Statutes (1993), defines a "firearm" as
any weapon (including a starter gun) which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; and destructive device; or any machine gun. The term "firearm" does not include an antique firearm unless the antique firearm is used in the commission of a crime.
This definition excludes BB guns because they do not use the "action of an explosive." On the other hand, the definition includes the frame of a firearm and does not require that the firearm be loaded or operable during the criminal episode. Bentley v. State, 501 So.2d 600 (Fla.1987). See, e.g., State v. Altman, 432 So.2d 159 (Fla. 3d DCA 1983) (.22 derringer without cylinder is firearm).
Because the definition of "firearm" does not involve proof that the gun is loaded or operable, a defendant's use of a firearm during a crime can be established even if the gun is not recovered and introduced into evidence. Circumstantial evidence can be sufficient to establish the use of a firearm. Bradley v. State, 413 So.2d 1248 (Fla. 1st DCA 1982); T.T. v. State, 459 So.2d 471 (Fla. 1st DCA 1984); Meyer v. State, 498 So.2d 554 (Fla. 4th DCA 1986); Council v. State, 691 So.2d 1192 (Fla. 4th DCA 1997).
*559 In this case, numerous witnesses testified that Mr. Mitchell committed crimes while carrying what they thought was a firearm. If Mr. Mitchell had discarded his gun between the events at the chiropractor's office and his arrest at the mobile home park, such evidence may have been sufficient to support convictions involving firearms. Because the traditional definitions of dangerous and deadly weapons do not expressly include inoperable parts of those weapons, Mr. Mitchell's decision to retain his empty BB gun makes this case far more difficult for the state to prove.

VI. ARMED TRESPASS
The state charged Mr. Mitchell with two counts of armed trespass pursuant to section 810.08(2)(c), Florida Statutes (1993). A trespasser who is armed with a "firearm or other dangerous weapon" is guilty of a third-degree felony. "Dangerous weapon" is not defined in chapter 810 or in chapter 790. The standard jury instruction, which was given in this case, defines a "dangerous weapon" as "any weapon that, taking into account the way it is used, is likely to produce death or great bodily harm."[2] Fla. Std. Jury Instr. (Crim.) 142. The concept of a "dangerous weapon," as so defined, has existed in Florida's criminal law for well over a century. See, e.g., § 782.03, Fla. Stat. (1993) (excusable homicide statute, initially enacted in 1868); Wood v. State, 31 Fla. 221, 12 So. 539 (1893).
If the jury must "take into account" the fact that the state failed to prove that the BB gun was loaded or operable when Mr. Mitchell pointed and aimed it in his wife's home and in the mobile home, then the precise way it was used was not likely to produce death or great bodily harm. Despite his threats and the fear he surely created in the minds of his victims, the empty BB gun was no more deadly than a toy gun or water pistol. Thus, these convictions cannot stand unless the jury was allowed to rely upon the defendant's actions suggesting that the gun was loaded and upon the victims' reasonable belief that the BB gun was loaded. We will defer analysis of that issue until the other offenses have been examined.

VII. ROBBERY WITH A DEADLY WEAPON
The counts of robbery and attempted robbery in this case arise from Mr. Mitchell's actions at the home of his wife. Simple robbery is the taking of property from a person through the use of force and is a felony of the second degree. § 812.13(1), (2)(c), Fla. Stat. (1993). If the robber carries a "weapon," the offense becomes a first-degree felony. § 812.13(2)(b), Fla. Stat. (1993). If the robber carries a "firearm or other deadly weapon," the offense increases to a first-degree felony punishable by life in prison. § 812.13(2)(a), Fla. Stat. (1993). The robbery statute does not define these various types of weapons.
It is common to rely upon chapter 790 for definitions of various weapons and firearms. Unfortunately, the definition of "weapon" in section 790.001(13) states:
"Weapon" means any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon, except a firearm or a common pocketknife.
(Emphasis added.)[3] Because the definition of "weapon" in chapter 790 includes an enumerated list of devices and "other deadly weapons," it cannot help us distinguish between a "weapon" and a "deadly weapon."[4]
The standard jury instruction, which was given in this case, defines a "deadly *560 weapon" as a weapon "if it is used or threatened to be used in a way likely to produce death or great bodily harm." Fla. Std. Jury Instr. (Crim.) 156.[5] The definition of "deadly weapon" differs from the definition of "dangerous weapon" in that a weapon may be deadly based on the threat of its use in a way likely to cause great bodily harm. In this case, if the threat employed in the robbery is viewed from Mr. Mitchell's perspective, there is no proof that he thought his empty BB gun was likely to produce great bodily harm. Viewed from the victims' perspective, it was reasonable and prudent for them to assume that the gun could produce great bodily harm.
Because this definition of "deadly weapon" contains the concept of a "threat," it could be classified as a broader category of weapons than "dangerous weapons." Early case law, however, suggests that the term "dangerous weapon" is "milder" than "deadly weapon," but "otherwise of the same meaning." Clemons v. State, 48 Fla. 9, 37 So. 647 (1904).[6] We see no basis to require a different analysis in determining whether the BB pistol in this case was a "dangerous" or "deadly" weapon.

VIII. ASSAULT WITH A DEADLY WEAPON
The assaults in this case arise from Mr. Mitchell's conduct at the chiropractic office. Assault becomes aggravated assault if the threat of violence is performed "with a deadly weapon without intent to kill." § 784.021(1)(a), Fla. Stat. (1993). Thus, the type of weapon required is identical to the weapon required for robbery with a deadly weapon. Mr. Mitchell actually used the BB gun as a bludgeon on his wife in that office, but he never threatened to hit the assault victims; he threatened to shoot them. Again, if we assess the likelihood of harm from his perspective, there is no evidence to support a conviction for aggravated assault. From the victims' perspective, however, there is ample evidence. It is perhaps noteworthy that his use of an empty BB gun substantially increased the risk that someone in the office would use a real firearm or other weapon in self-defense and cause great bodily harm to an innocent bystander.

IX. BB GUNS AS WEAPONS
Case law considering the status of BB guns tends to make the deadliness or dangerousness of a BB gun a factual question for the jury. In Depasquale v. State, 438 So.2d 159 (Fla. 2d DCA 1983), this court held that a BB gun was a deadly weapon when used in a robbery. We relied on a common definition of deadly weapon: "any instrument that, when used in the ordinary manner contemplated by its design and construction, will or is likely to cause death or great bodily harm." Id. at 160 (quoting 56 Am.Jur. Weapons and Firearms § 2 at 991 (19)). The opinion does not disclose whether the BB gun in that case was loaded or operable, but a BB gun is typically loaded when used in "the ordinary manner." It is not entirely clear whether Depasquale held that all BB guns are deadly as a matter of law or whether deadliness was a factual question. See also Emshwiller v. State, 443 So.2d 488 (Fla. 2d DCA 1984).
In Duba v. State, 446 So.2d 1167 (Fla. 5th DCA 1984), the Fifth District expressly held that whether an air pistol was a deadly weapon for purposes of aggravated assault was an issue for the jury. In that case the trial court had prohibited defense counsel from arguing that an inoperable pellet gun was not a deadly weapon. The Fifth District held this jury question was dependent on all factors, including whether, at the time of the offense, the gun was capable of expelling a projectile. See also State v. Jeffers, 490 *561 So.2d 968 (Fla. 5th DCA 1986) (applying Duba rationale in aggravated battery case).
In Lynn v. State, 567 So.2d 1043 (Fla. 5th DCA 1990), the defendant committed a robbery while armed with a handgun. The defendant threatened to "blow" the cashier's "brains out." The police recovered a pellet gun from the defendant's car after it crashed during a chase. The gun was inoperable because pellets were jammed in the barrel and a CO 2 cartridge was missing. The court held that the deadliness of the weapon was a jury question, but noted that the evidence supported the possibility that the gun was operable at the time of the offense.
In Gooch v. State, 652 So.2d 1189 (Fla. 1st DCA), review denied, 659 So.2d 1086 (Fla. 1995), the First District considered a jury instruction issue in an armed robbery case where the defendant was apprehended shortly after a robbery, and an unloaded air-powered pump BB gun was found in his car. The court recognized that the deadliness of the weapon was a factual question to be decided by the jury. Most recently, in Dale v. State, 669 So.2d 1112 (Fla. 1st DCA 1996), the First District reaffirmed Gooch and certified a question to the supreme court, which has granted review. Dale v. State, 678 So.2d 337 (Fla.1996). In Dale, there was evidence that the BB gun was operational.
The case law on this issue is similar to the case law holding that whether a pocketknife is a weapon is a factual question for the jury. In State v. Ortiz, 504 So.2d 39 (Fla. 2d DCA 1987), where there was no factual dispute about the characteristics of the knife, this court held that a jury could decide whether a four-inch pocketknife was or was not a concealed weapon. Until this court held that the "common pocketknife" exception in section 790.001(13) was unconstitutionally vague, L.B. v. State, 681 So.2d 1179 (Fla. 2d DCA 1996), the Ortiz rule of law allowed for differing jury outcomes in cases involving identical knives in identical pockets or purses. Similarly, if the issue whether an unloaded BB gun is a "deadly weapon" is a factual question, then different juries could arrive at disparate verdicts under identical or similar facts. An additional concern is, given that society has a choice, the law might prefer a person determined to commit a robbery do so with an empty BB gun rather than with a loaded gun.

X. OTHER DEADLY WEAPONS CASES
Whether an unloaded BB gun is a dangerous or deadly weapon is an issue that should not be decided without considering cases that address other weapons. The case law reflects competing, if not conflicting, approaches for replica weapons, toy guns, and items that were used by defendants as if they were deadly weapons.
In Bates v. State, 561 So.2d 1341 (Fla. 2d DCA 1990), the defendant used a "nut driver" in a robbery. He concealed most of this device so that it looked like a .22 caliber pistol and told the victim that he had a gun. This court held that, as a matter of law, no deadly weapon was used in the robbery because the defendant never threatened to use the nut driver as a bludgeon and he could not use it as a gun. See also Schram v. State, 614 So.2d 646 (Fla. 2d DCA 1993) (bulge in pocket that may have been knife insufficient to establish deadly weapon).
Likewise, in Brooks v. State, 605 So.2d 874 (Fla. 1st DCA 1992), quashed on other grounds, 630 So.2d 527 (Fla.1993), the First District held that a starter pistol could not be a deadly weapon, as used in a robbery, because the state failed to "prove that the starter pistol had a capability to injure." The pistol was used like a gun but "would or could [not] cause death or inflict serious bodily harm." Id. at 875.
These cases are consistent with I.O. v. State, 412 So.2d 42 (Fla. 3d DCA 1982), which held that a toy shotgun was not a deadly weapon, even though the victim of an aggravated assault had extensive weapons training and believed the toy gun was real. That case announced an objective test, which examined the nature and actual use of an instrument, to determine whether it was a deadly weapon.
I.O. was distinguished in T.T. In T.T., the robber held an object that appeared to be a gun and verbally threatened to shoot his victims. Apparently, no gun was recovered, *562 and the defendant argued that he was being convicted solely on the victims' subjective fears that he used a firearm. The First District held that the defendant's threats during his flight were sufficient evidence to prove that he used a firearm in the robbery. 459 So.2d at 472. Under the T.T. standard, if Mr. Mitchell had successfully discarded his BB pistol prior to his arrest, the evidence in this case, including his verbal threats, not only would have supported a determination that he used a "deadly weapon" but also would have supported a conviction for using a "firearm."
In Shelby v. State, 541 So.2d 1219 (Fla. 2d DCA 1989), this court reviewed a sexual battery case in which the defendant "threatened to use a deadly weapon." The defendant claimed to have a gun, but never displayed any weapon. This court held that the defendant's claim was sufficient to support the conviction. Judge Campbell's opinion cogently observes: "We do not believe that the legislature intended to require a sexual battery victim, who is verbally threatened with a gun or other deadly weapon, to demand satisfactory proof from the perpetrator of the actual existence of the weapon." Id. at 1221. See also Gibbs v. State, 623 So.2d 551 (Fla. 4th DCA 1993). These cases, however, may be distinguishable from this case because section 794.011(3), Florida Statutes (1995), proscribes "threatening" with a deadly weapon while committing a sexual battery.
In at least two other cases, circumstantial evidence has been used to prove that a weapon or deadly weapon was used during an offense. See, e.g., Fletcher v. State, 472 So.2d 537 (Fla. 5th DCA 1985) (cold, hard object held to throat could be razor blade, as robber claimed); Smith v. State, 645 So.2d 124 (Fla. 1st DCA 1994) (some sharp object against neck is deadly weapon).
Judge Webster has made a valiant effort to reconcile many of these cases in Butler v. State, 602 So.2d 1303 (Fla. 1st DCA 1992). Butler involved a robbery in which the defendant used a concealed object. The victims believed the object was a gun, even though the defendant never expressly stated that it was. The opinion contains a good discussion on the insufficiency of a victim's subjective belief that a weapon was used during a crime to support a weapon's charge. The First District concluded the evidence in Butler was insufficient to prove the use of a deadly weapon. Butler distinguishes T.T. and other cases on the basis that those cases involved additional testimony that the defendant verbally threatened to shoot the victim.

XI. CONCLUSION
We are not convinced that the preceding cases can be fully reconciled. Likewise, we suspect that these issues could be better addressed if the legislature revised the statutes to contain an adequate, modern list of weapons, while distinguishing "weapons" from "deadly weapons" and retaining "dangerous weapon" only if the legislature intends that term to have a meaning significantly different from "deadly weapon."
There is clear proof that Mr. Mitchell used a BB pistol during all of these offenses. With both words and actions, he implied that the gun was loaded and operable. Nothing visible to any victim in this case would lead any rational person to conclude that the BB gun was not a loaded and operable, deadly or dangerous weapon. In light of the reasoning in Depasquale, and influenced by the treatment of verbal threats in both Shelby and Butler, we conclude that this evidence is sufficient to support these convictions. We cannot deny that our reasoning assesses the likelihood of injury from a reasonable victim's perspective and not from the perspective of the defendant, who knows his weapon is unloaded or inoperable. We simply conclude that, under these circumstances, this limited reliance upon a victim's perspective is a correct application of the law.
Affirmed.
PATTERSON, A.C.J., and LAZZARA, J., concur.
NOTES
[1] The Marksman Repeater BB pistol has been the subject of several reported opinions since 1980. In Virginia, it is a firearm. Holloman v. Commonwealth, 221 Va. 196, 269 S.E.2d 356 (1980). In Georgia, it is not a firearm. Fields v. State, 216 Ga.App. 184, 453 S.E.2d 794 (1995). In New Jersey, it is a weapon. State v. Evans, 181 N.J.Super. 455, 438 A.2d 340 (App.Div. 1981). In Texas, it is a deadly weapon. Francis v. State, 746 S.W.2d 276 (Tex.App.1988). In a case with many similarities to Mr. Mitchell's case, an Ohio appellate court held that a Marksman Repeater BB gun was not a firearm, but could be a deadly weapon. State v. Mills, 73 Ohio App.3d 27, 595 N.E.2d 1045 (1991). Accurate photographs and alleged specifications for this weapon are available on the Internet. See The Edge Company, Marksman Pistol with Dartboard Set (last updated May 13, 1997) 

[2] The information in this case alleged that the weapon was a "deadly weapon"the term appropriate for robbery or assault, but not for trespass or burglary. This technical error was not raised in the trial court.
[3] This list of weapons has evolved from its first appearance at the turn of the century in the Laws of Florida as a list of prohibited concealed weapons. The original catch-all phrase was "other weapon." Ch. 4929, Laws of Fla. (1901). When the legislature revised chapter 790 in 1969, it added the requirement that the "other weapon" be a "deadly" weapon. Ch. 69-306, § 1 at 1104, Laws of Fla.
[4] Arguably, because a BB gun is not an enumerated weapon in section 790.001(13), it can only be a "weapon" if it is also a "deadly weapon."
[5] "Deadly weapon," like "dangerous weapon" is a longstanding term in Florida law. See Davis v. State, 25 Fla. 272, 5 So. 803 (1889); Pittman v. State, 25 Fla. 648, 6 So. 437 (1889).
[6] The theory that "deadly weapons" are a subset of a larger group of "dangerous weapons" is also supported by other earlier cases. See People v. Seawright, 72 Cal.App. 414, 237 P. 796 (1925); Jeffery F. Ghent, Annotation, Fact That Gun Was Unloaded as Affecting Criminal Responsibility, 68 A.L.R.4th 507, 517 (1989). A general reading of more recent cases containing both terms causes this court to believe that the terms are now used interchangeably in most jurisdictions.