DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

M.D.M.,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D22-3945

_____

December 6, 2023

Appeal from the Circuit Court for Hillsborough County; Kim Brennan, Judge.

Howard L. Dimmig, II, Public Defender, and Caroline Joan S. Picart, Assistant Public Defender, Bartow, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and William C. Shelhart, Assistant Attorney General, Tampa, for Appellee.

KHOUZAM, Judge.

We affirm the order on appeal, which finds M.D.M., a juvenile, guilty of possession of a weapon on school property and trespass on school property with a weapon. We write to discuss M.D.M.'s contention that the trial court erroneously admitted hearsay testimony, without which the evidence would have been insufficient to establish that he

possessed a deadly weapon. Although we agree with M.D.M. that the challenged statement should not have been admitted, we hold that, in the context of this case, the error was harmless as a matter of law.

## BACKGROUND

With respect to the two counts relevant to this appeal,[1] a petition for delinquency alleged that M.D.M had committed one count of possession of a weapon on school property, in violation of section 790.115(2)(b), Florida Statutes (2022), and one count of trespass on school property with a weapon, in violation of section 810.095, Florida Statutes (2022).

At the bench trial, a high school student testified that he knew M.D.M. because they had played football together at school. The witness testified that M.D.M. had previously told him that M.D.M. "had got kicked out of school, and that he no longer went to" their high school. The witness clarified that by "kicked out," he meant "expelled." M.D.M. told the witness he was attending "another educational system."

The witness testified that in August 2022 at the high school, M.D.M. approached him when he was alone in a bathroom. M.D.M. asked the witness if he wanted to buy "a gun" or knew someone who did. The witness declined the offer but asked to see the "gun." M.D.M. complied and showed the witness the back half of what appeared to be a handgun in M.D.M.'s bookbag.

After the bathroom encounter ended, the witness reported it to the school office. The school was locked down and, following a chase, law enforcement apprehended M.D.M. During the chase, M.D.M. had thrown

_____

[1] Although M.D.M. was also charged with disrupting a school campus or function, he was found not guilty of that charge.

2

an object over a railing. The object was soon located and determined to be the "gun" that M.D.M. had attempted to sell the witness.

In fact, the "gun" was not a firearm; it was a BB gun that looked like a firearm. None of the officers who testified at the bench trial were very familiar with or used BB guns. But they knew from their experience with actual firearms that this was merely a BB gun.

Although there was no dispute below that the BB gun was found loaded with BBs, a major dispute arose about whether or not it was found with a $CO_2$ cartridge, which would provide the propulsion mechanism to fire the BBs. No officer who testified saw any cartridge. Neither is a cartridge depicted in any of the photographs of the BB gun in the record nor mentioned in the criminal report affidavit.

The officer who authenticated photographs of the BB gun testified they were taken by Deputy Lupco. But when Deputy Lupco was on the stand himself, he gave conflicting testimony about who took those photographs. Although Deputy Lupco initially testified unequivocally that he took the photographs, when the issue was later explored further, he denied taking one of them. He did not reconcile the testimony.

Deputy Lupco testified that a BB gun can be a dangerous weapon if it is loaded, has a $CO_2$ cartridge, and is fired into someone's eye. The State then asked: "Now you said a $CO_2$ cartridge. Is that the same cartridge that was found in this gun?" He answered "Yes, ma'am."

On cross, Deputy Lupco admitted that he "didn't personally inspect" the BB gun. Regarding a $CO_2$ cartridge, Deputy Lupco testified: "I didn't personally see one. I was told that it did have a CO2."

Over objection, Deputy Lupco testified that another officer named "Deputy Steward" stated while inspecting the BB gun "that it had the $CO_2$ cartridge along with BB rounds." No further information was

3

provided about this inspection, such as when or how it occurred. Nor was any information provided about Deputy Steward, such as his full name or his experience with BB guns. Deputy Steward did not testify.

A motion for judgment of dismissal was denied as to the two counts for which M.D.M. was found guilty. This appeal followed.

## ANALYSIS

M.D.M. challenges as hearsay the introduction of the testimony that the BB gun had a CO2 cartridge and claims that, without this improper testimony, the State failed to establish that the BB gun qualified as a deadly weapon. The State responds that the testimony was properly admitted under the spontaneous statement exception to the hearsay rule or, alternatively, that any error was harmless.

We hold that the challenged statement was inadmissible hearsay, not admissible under the spontaneous statement exception. However, we also conclude that this error was harmless because, even without the hearsay, the State independently established with other evidence that the BB gun qualified as a deadly weapon under Florida law.

Hearsay Testimony

A trial court's ruling admitting evidence is reviewed for an abuse of discretion, which discretion is limited by the rules of evidence. *See, e.g.*, *Padgett v. State*, 73 So. 3d 902, 904 (Fla. 4th DCA 2011). The separate question of whether a statement is hearsay is reviewed de novo. *Id.*

Under section 90.801(1)(c), Florida Statutes (2022), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It is inadmissible, except as provided by statute. § 90.802.

To that end, "[t]he provision of s. 90.802 to the contrary notwithstanding," section 90.803 sets forth many hearsay exceptions,

4

which "are not inadmissible as evidence, even though the declarant is available as a witness."  The first such exception reads:

> **(1) Spontaneous statement.**--A spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.

Until 2008, this exception required the declarant "to be laboring under the influence of a startling event at the time that the statement is made."  *Deparvine v. State*, 995 So. 2d 351, 369 (Fla. 2008) (quoting *Hutchinson v. State*, 882 So. 2d 943, 951 (Fla. 2004)).  But that requirement was ultimately lifted as being "contrary to the underlying principles embodied in section 90.803(1)."  *Id.* (abrogating *Hutchinson*).

Under current Florida law, the spontaneous statement exception requires that the statement be made not only contemporaneously, but also spontaneously, or "without the declarant first engaging in reflective thought."  *Id.* (quoting *Ibar v. State*, 938 So. 2d 451, 467 (Fla. 2006)).  In *Deparvine, see id.*, the supreme court cited favorably to *J.M. v. State*, 665 So. 2d 1135, 1137 (Fla. 5th DCA 1996), where the Fifth District explained:

> While the language in the statutory exception specifically includes the requirement that the purported spontaneous statements be made while the declarant perceives the event or condition, or immediately thereafter, contemporaneity is not the only requirement, but instead, the statement must also, of course, be spontaneous; that is, the statement must be made without the declarant first engaging in reflective thought.

(Emphasis added.)  Borrowing language from Professor Ehrhardt, the Fifth District clarified that "the spontaneity of the statement negatives the likelihood of conscious misrepresentation by the declarant and provides the necessary circumstantial guarantee of trustworthiness to

justify the introduction of the evidence." *Id.* (quoting Charles W. Ehrhardt, *Florida Evidence*, § 803.1, at 612 (1995)).

In *J.M.*, the statement at issue was witness McAllister's identification of the defendant in response to police questioning. *Id.* at 1136-37. In concluding that the "statement of identification does not fall within the definition of a spontaneous statement," the Fifth District reasoned as follows:

> In this regard, the trial evidence established that, by the time McAllister made the statement implicating the defendant, he had been approached by a uniformed police officer who questioned him; he had admitted to committing a crime; and he had moved about in his wheelchair as if to assist the officer in recovering the cocaine. <u>These events enabled McAllister to engage in the very type of reflective thought that is inconsistent with aspects of reliability upon which the spontaneous statement exception is founded</u>. Accordingly, McAllister's statement should not have been admitted into evidence during the defendant's trial.

*Id.* at 1137 (emphasis added).

Thus, the spontaneity requirement is more than merely temporal, focusing also on the absence of reflective thought. *Cf. Monfiston v. State*, 924 So. 2d 61, 64 (Fla. 4th DCA 2006) (reasoning in analyzing related exception for excited utterances that, despite the witness's "nervous excitement, . . . under the circumstances it is hard to conclude that the statement was made before there was time for reflective thought" where "[a]n investigation of the crime had already commenced [and] the officer was seeking out information and interrogating witnesses").

Here, the statement at issue was made by one officer to another, after the defendant was in custody, while inspecting evidence for the purpose of preserving it and investigating a crime. Specifically, it was a description of a static condition of a BB gun in police possession: whether it included a $CO_2$ cartridge that would enable it to shoot BBs.

6

On this record, we cannot "conclude that the statement was made before there was time for reflective thought." *Monfiston*, 924 So. 2d at 64.

Whereas the State focuses on the contemporaneity of the statement, at no point has it persuasively explained how the statement also meets the separate requirement of spontaneity. Nor has the State attempted to distinguish this particular statement from any other statement officers might make to one another while inspecting evidence in their possession after the defendant is apprehended.

Not only would the State's broad interpretation of the spontaneous statement exception effectively swallow the rule, but also, the type of routine post-arrest evidentiary inspection described here—which was not alleged to have involved any exigency or safety concerns—appears to involve "the very type of reflective thought that is inconsistent with aspects of reliability upon which the spontaneous statement exception is founded." *J.M.*, 665 So. 2d at 1137. Accordingly, Deputy Lupco's testimony about what he overheard Deputy Steward say about the BB gun was inadmissible hearsay.

Harmless Error

Under the harmless error test, the State is required, "as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

Here, the improper hearsay went to the issue of whether the BB gun qualified as a deadly weapon under Florida law. But there was other properly admitted evidence that independently established the same point. So the erroneous admission was harmless in the context of the case. *See id.* (explaining that the harmless error test "requires an

7

examination of the entire record by the appellate court <u>including a close examination of the permissible evidence on which the jury could have legitimately relied</u>" (emphasis added)).

The 2022 versions of both statutes cited in Counts I and II specifically addressed weapons "as defined in s. 790.001(13)." §§ 790.115(2)(b); 810.095(1).  In turn, that statute defined "Weapon" as "any dirk, knife, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, <u>or other deadly weapon</u> except a firearm or a common pocketknife, plastic knife, or blunt-bladed table knife." § 790.001(13) (emphasis added).

Here, it is undisputed that the BB gun at issue does not qualify as a firearm or any of the other items specifically identified in the 2022 version of section 790.001(13).  Thus, in order to violate either statute the BB gun must have qualified as a "deadly weapon."

On that issue, the Florida Supreme Court has repeatedly and unequivocally "held that whether a BB gun—loaded or unloaded—is a deadly weapon is a jury question." *Mitchell v. State*, 703 So. 2d 1062, 1062 (Fla. 1997) (citing *Dale v. State*, 703 So. 2d 1045 (Fla. 1997)).  And with respect to the BB gun's operability, the supreme court has also specified that "[t]he fact that the gun was recovered without BBs, pellets, or gas cartridge is not dispositive." *Dale*, 703 So. 2d at 1047.

More recently, in another juvenile appeal, this court canvassed Florida law addressing "[w]hether a particular BB gun qualifies as a deadly weapon under section 790.001(13)." *C.W. v. State*, 205 So. 3d 843, 845 (Fla. 2d DCA 2016).  We observed that "[i]n the cases where Florida courts have determined that a BB gun qualifies as a deadly weapon, there has been evidence that the particular BB gun was capable

8

of causing great bodily harm or that the gun was used in a manner likely to result in great bodily harm." *Id.* at 844 (collecting cases).

One such case was the supreme court's decision in *Mitchell* approving this court's "holding that a BB gun was a deadly weapon when the defendant implied through his words and actions that the BB gun was loaded and operable." *C.W.*, 205 So. 2d at 844 (citing *Mitchell v. State*, 698 So. 2d 555, 562 (Fla. 2d DCA), *approved*, 703 So. 2d at 1062 (Fla. 1997)). Ultimately in *C.W.*, we reversed a finding that a BB gun was a deadly weapon because "the State presented no evidence that the BB gun was loaded or operable <u>or that C.W. implied or otherwise represented that the BB gun was operable, loaded, or capable of inflicting death or great bodily injury through his actions</u>." *Id.* at 845 (emphasis added); *see also Gartner v. State*, 118 So. 3d 273, 277 (Fla. 5th DCA 2013) ("A jury can conclude that a [BB gun] is either dangerous or deadly if it is implied by the defendant's words or actions.").

Here, although there is no dispute that the BB gun was found with pellets in it and was thus "loaded," there was no admissible evidence that it also had a CO2 cartridge necessary to shoot them. But the lack of a cartridge is not dispositive, and there was evidence that M.D.M. implied that the BB gun was operable by attempting to sell it. There was no evidence that in doing so, M.D.M. suggested that it was inoperable or that it needed repair or additional parts in order to work.

Viewed in the light most favorable to the State, *see, e.g., T.A.K. v. State*, 258 So. 3d 559, 561 (Fla. 2d DCA 2018), M.D.M.'s advertising the BB gun for sale as "a gun" without mentioning any operability problems constituted at least an implication that it was operable. Indeed, in denying the motion for judgment of dismissal, the trial court expressly relied on the fact that "the gun was being marketed as operational,"

9

which was sufficient in the context of this case to establish its deadly-weapon status even absent admissible evidence of a $CO_2$ cartridge.

At bottom, even though the trial court erred in admitting the hearsay statement, the error was harmless as a matter of law in the particular context of this case.  Accordingly, we affirm.

Affirmed.

LUCAS and ROTHSTEIN-YOUAKIM, JJ., Concur.

—————————————

Opinion subject to revision prior to official publication.