882 So.2d 943 (2004)
Jeffrey G. HUTCHINSON, Appellant, Cross-Appellee,
v.
STATE of Florida, Appellee, Cross-Appellant.
No. SC01-500.
Supreme Court of Florida.
July 1, 2004.
*948 Kepler B. Funk, Jack L. Platt and Keith F. Szachacz of Funk & Szachacz, P.A., Melbourne, FL, for Appellant, Cross-Appellee.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee, Cross-Appellant.
PER CURIAM.
We have on appeal four convictions of first-degree murder with a firearm and three sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the convictions of first-degree murder and the sentences of death.

FACTS
Jeffrey G. Hutchinson (Hutchinson) was indicted by a grand jury for the first-degree murders of his live-in girlfriend, Renee Flaherty (Renee), and her three children: four-year-old Logan, seven-year-old Amanda, and nine-year-old Geoffrey. The jury found him guilty of four counts of first-degree murder with a firearm. Hutchinson waived his right to a jury at the penalty phase trial, but presented mitigation to the trial judge. At the conclusion of the penalty phase, the trial judge imposed a death sentence for the murder of each child.
On the evening of the murders, Hutchinson and Renee argued. Hutchinson packed some of his clothes and guns into his truck, left, and went to a bar. Renee then called her friend, Francis Pruitt (Pruitt), in Washington and told her that she thought Hutchinson had left for good. The bartender testified that Hutchinson arrived around 8 p.m. Hutchinson told the bartender that "Renee is pissed off at me," drank one and a half glasses of beer and then left the bar muttering to himself. Other witnesses testified that Hutchinson drove recklessly after he left the bar.
Approximately forty minutes after Hutchinson left the bar, there was a 911 call from Hutchinson's home. The caller stated, "I just shot my family." Two of Hutchinson's close friends identified the caller's voice as Hutchinson's. Hutchinson said to the 911 operator, "there were some guys here." He told the operator that he did not know how many people were there, he did not know how many had been hurt, and he did not know how they had been injured. Deputies arrived at Hutchinson's home within ten minutes of the 911 call and found Hutchinson on the ground in the garage with the cordless phone nearby. The phone call was still connected to the 911 operator. Deputies found Renee's body on the bed in the master bedroom, Amanda's body on the floor near the bed in the master bedroom, and Logan's body at the foot of the bed in the master bedroom. Each had been shot once in the head with a shotgun. Deputies found Geoffrey's body on the floor in the living room between the couch and the coffee table. He had been shot once in the chest and once in the head. The murder weapon, a Mossberg 12-gauge pistol-grip shotgun which belonged to Hutchinson, was found on the kitchen counter. Hutchinson had gunshot residue on his hands. He also had Geoffrey's body tissue on his leg.
Hutchinson's defense at trial was that two men came into the house, he struggled with them, and they shot Renee and the children and fled. Hutchinson was examined by an EMT at the scene and a jail *949 nurse. He had no injuries. Hutchinson also presented the defense of intoxication, and he argued that this was a crime of passion, not first-degree murder.
The jury found Hutchinson guilty of four counts of first-degree murder with a firearm. Hutchinson waived a jury recommendation at sentencing. The trial court conducted a colloquy, found the waiver voluntary, and excused the jury.
At sentencing, the State presented several witnesses, including Dr. Michael E. Berkland, a forensic pathologist. Dr. Berkland testified that the events occurred as follows: The front door had been locked with a dead bolt. The front door was "busted" down, and Geoffrey's blood was found on the top of the door indicating that Geoffrey was shot after the door was "busted" down. The shooting started in the master bedroom. Renee was the first victim, shot once in the head  a conclusion drawn from the fact that Renee was still lying on the bed at the time she was shot. Amanda was shot second with one shot to her head. Dr. Berkland reached this conclusion because not much of Logan's blood was on Amanda, and there would have been more of his blood on her had Logan been shot second. Logan was the third to be shot. Three shell casings were found inside the master bedroom in front of the closet. Dr. Berkland concluded from the shell casings that Hutchinson was standing in front of the closet when he shot the first three victims. Hutchinson then shot Geoffrey twice. Geoffrey was first shot just outside the doorway of the master bedroom. The first shot went through his arm, which was in a defensive posture, and through his chest. Dr. Berkland concluded that Geoffrey was able to see the bodies of his mother, sister, and brother from this location. The second shot was to Geoffrey's head. Geoffrey was kneeling at the time of the second shot, and, Dr. Berkland concluded, Geoffrey "absolutely was conscious" at the time of the second shot. He died in the living room on the floor between the couch and the coffee table.
The defense presented evidence of mitigation, including but not limited to evidence involving Hutchinson's diagnosis of Gulf War Syndrome and Attention Deficit Disorder, the testimony of Hutchinson's family, and evidence of awards and honors Hutchinson had received. The State presented evidence in rebuttal.
Both parties presented sentencing memoranda, and the trial court held a Spencer[1] hearing. The trial court then held a sentencing hearing and imposed a life sentence for the murder of Renee Flaherty and three death sentences for the murders of the three children.
Hutchinson now raises ten issues in this appeal: (1) whether the trial court improperly instructed the jury; (2) whether the trial court erred in admitting certain testimony as an excited utterance; (3) whether the trial court erred in repeatedly overruling objections to the State's closing argument; (4) whether the trial court erred in denying Hutchinson's motion for mistrial; (5) whether the trial court erred in denying Hutchinson's motion for judgment of acquittal; (6) whether the trial court erred in denying Hutchinson's motion for a new trial; (7) whether the trial court erred in considering section 921.141(5)(1), Florida Statutes (2000), as an aggravating circumstance; (8) whether the trial court erred in finding that Hutchinson committed the murder of the children during the course of an act of aggravated child abuse; (9) whether the trial court erred in finding heinous, atrocious, or cruel (HAC) as an *950 aggravating circumstance in the murder of Geoffrey Flaherty; and (10) whether death is a proportional sentence.
The State filed a cross-appeal raising one issue: whether aggravated child abuse should have been properly considered separately from the under-the-age-of-twelve aggravator. We address each issue below.

1. Special Jury Instruction on Premeditation
At the jury instruction conference, the State requested the following special instruction:
You may consider the nature of the weapon used, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted upon the victim in determining whether the crime was premeditated.
Hutchinson objected to the special instruction, but did not provide a basis for the objection. The trial court granted the State's request, and gave the State's requested special instruction after giving the standard instruction on premeditation. Hutchinson now argues that the special instruction amounts to judicial comment on the evidence.
Hutchinson did not properly preserve this issue for appellate review. Although defense counsel objected to the special instruction at the jury instruction conference and later renewed the objection, defense counsel made no specific argument and did not set forth the basis for the objection. Defense counsel failed to argue that the special instruction amounted to judicial comment on the evidence. Unless a specific argument asserting the legal grounds for the objection is made, the issue may not be considered on appeal. See Jennings v. State, 782 So.2d 853, 862 (Fla.2001) (citing Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)). Steinhorst holds that "[i]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below." 412 So.2d at 338. Because the specific contention made here was not asserted below, this claim is procedurally barred.[2]

2. Excited Utterance or Spontaneous Statement
Hutchinson argues that the trial court erred in admitting the testimony of Renee's friend, Pruitt, because it was inadmissible hearsay. Pruitt recounted a telephone conversation between the two women on the night of the murders. In the course of the conversation, Renee told Pruitt that she had a big fight with Hutchinson and that he had taken some of his things and left. Over Hutchinson's hearsay objection, the trial court admitted the testimony as an excited utterance. The State now contends the testimony was admissible as either an excited utterance or a spontaneous statement.
Hearsay is an out-of-court statement testified to by a person other than the declarant which is offered for the truth of the matter asserted therein. See § 90.801(1)(c), Fla. Stat. (2003); Hitchcock v. State, 636 So.2d 572, 573 (Fla.1994). Such hearsay statements are generally inadmissible because the declarant is not testifying under oath, the trier of fact cannot observe the declarant's demeanor, and the declarant is not subject to cross-examination. See Banks v. State, 790 So.2d 1094, 1097 (Fla.2001). However, hearsay statements may be admitted into evidence if the trial court finds that one of the exceptions provided for by statute is applicable *951 to the facts and circumstances of the case. See §§ 90.802, 90.803, 90.804, Fla. Stat. (2003); cf. Rigdon v. State, 621 So.2d 475, 478 (Fla. 4th DCA 1993) ("In the absence of an applicable exception, hearsay evidence is inadmissible."). The State asserts that Pruitt's hearsay statement was admissible either as an excited utterance or as a spontaneous statement. We disagree.
Section 90.803(2), Florida Statutes (2003), defines an excited utterance as follows:
Excited utterance.  A statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
Section 90.803(1), Florida Statutes (2003), defines a spontaneous statement as follows:
Spontaneous statement.  A spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.
Both the excited utterance and the spontaneous statement exceptions require the declarant to be laboring under the influence of a startling event at the time that the statement is made. See State v. Jano, 524 So.2d 660, 662 (Fla.1988) (explaining that the excited utterance exception and the spontaneous statement exception are primarily distinguishable by the time lapse between the event and the statement describing the event). Although the spontaneous statement and excited utterance exceptions to the hearsay rule overlap to some degree, there are two main differences. See id. at 661. First, the exceptions differ in the amount of time that may lapse between the event and the statement. See id. at 661-62. The excited utterance must be made before there is time for reflection, and the spontaneous statement must be made while perceiving the event or immediately thereafter. See id. Second, the exceptions differ in the statement describing the event. See id. An excited utterance "relates" to the event and includes acts, statements, occurrences and circumstances, see State v. Snowden, 345 So.2d 856, 860 (Fla. 1st DCA 1977), while the spontaneous statement describes the event. See Jano, at 662.
While an excited utterance need not be contemporaneous to the event, it must be made while the declarant is under the stress of the startling event and without time for reflection. See Rogers v. State, 660 So.2d 237, 240 (Fla.1995). In this case, the time between the startling event (the fight between Renee and Hutchinson) and the telephone conversation is not clearly ascertainable from this record. The most that can be said is that the fight probably occurred between 7 p.m. (the approximate time of Renee's conversation with another friend) and 7:30 p.m. (the approximate time of Renee's conversation with Pruitt). Without more information, we can only speculate as to whether Renee engaged in reflective thought. However, this was a long enough time interval to permit reflective thought. "[W]here the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." State v. Jano, 524 So.2d 660, 661 (Fla.1988) (quoting Edward W. Cleary, McCormick on Evidence, § 297, at 856 (3d ed.1984)). There is no evidence in the record to show what occurred between the fight with Hutchinson and the phone call to Pruitt. Absent some evidence that Renee did not *952 engage in reflective thought, the statement to Pruitt cannot be admitted as an excited utterance. See, e.g., Rogers v. State, 660 So.2d 237 (Fla.1995) (finding that the victim had eight to ten minutes for reflective thought, but based on witness testimony regarding the victim's behavior during that time period, the victim did not engage in reflective thought, and the victim's statements were admissible as an excited utterance). The fact that Renee was crying when she called Pruitt is not, by itself, sufficient to demonstrate that Renee did not engage in reflective thought. "A statement as to what occurred does not become admissible merely because the victim is still in an excited state." Charlot v. State, 679 So.2d 844, 845 (Fla. 4th DCA 1996). Because the record does not describe the fight between Renee and Hutchinson, or provide the time the fight was over, we have no evidence upon which to base a conclusion that Renee did not engage in reflective thought. Renee's statements to Pruitt are not, therefore, admissible under the excited utterance exception to the hearsay rule.
Renee's statements to Pruitt are not admissible under the spontaneous statement exception either. A spontaneous statement must be made "at the time of, or immediately following, the declarant's observation of the event or condition described." J.M. v. State, 665 So.2d 1135, 1137 (Fla. 5th DCA 1996). Like the excited utterance exception, the spontaneous statement exception also requires that "the statement must be made without the declarant first engaging in reflective thought." Id. For the reasons explained above, we cannot say that Renee did not first engage in reflective thought before she made the phone call to Pruitt because there is no evidence in the record to show what occurred between 7 and 7:30 p.m. The evidence shows that Hutchinson had already left the home when Renee made the phone call to Pruitt. This suggests that the argument had already occurred by the time the phone call was made. Thus, Renee's call to Pruitt was not made at the time of the fight, and we cannot ascertain from the record whether it was made immediately following the fight or while Renee was still perceiving the fight. Pruitt's testimony, therefore, is not admissible as a spontaneous statement.
However, any error in the admission of this testimony was harmless. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). Under DiGuilio,"[t]he question is whether there is a reasonable possibility that the error affected the verdict." Id. If the reviewing court can say beyond a reasonable doubt that the error did not affect the verdict, then the error is, by definition, harmless. Id. In this case, the admission of Pruitt's testimony did not affect the verdict.
The State relied on Pruitt's testimony to show that Hutchinson's motive for the murders was his argument with Renee. However, as the State points out, Pruitt's testimony was not the only evidence that the argument occurred. Hutchinson told the bartender, "Renee is pissed off at me." Also, when police found Hutchinson after responding to the 911 call, his clothes and other items were in his truck. From this, the jury could have reasonably concluded there was some type of disagreement between Renee and Hutchinson. Furthermore, the fact that Hutchinson and Renee had an argument does not provide any motive or explanation for the murder of the three children. Pruitt's testimony adds little, if anything, to the overwhelming evidence of guilt, which includes Hutchinson's call to 911 in which he told the operator he had just killed his family, the gunpowder residue on his hands, the fact that he was the owner of the murder *953 weapon, and the fact of the victims' blood and tissue found on his clothes. There is no reasonable possibility this error affected the verdict. We therefore deny relief on this claim.

3. Cumulative Effect of Repeatedly Overruled Objections
Hutchinson argues that, in closing argument, the State shifted the burden of proof, improperly bolstered the credibility of its witnesses, and argued facts not in evidence. Hutchinson claims that the trial court's repeated refusal to correct these errors affected the jury's deliberations. Because Hutchinson does not demonstrate that the trial court abused its discretion in any of the three alleged errors, he is not entitled to relief. See, e.g., Roberts v. State, 840 So.2d 962, 972 (Fla.2002) ("[C]laims of cumulative error are properly denied where individual claims have been found without merit....").
Hutchinson argues that the State shifted the burden of proof during closing argument when the prosecutor told the jury, "If there were no gunshot residue on his hands that would be valuable evidence of innocence," and that Hutchinson thought "the loss of Renee and those children was a reason to kill them, however clouded that judgment was, how illogical it was." It is improper for the State to shift the burden of proof in closing argument. See Gore v. State, 719 So.2d 1197, 1200 (Fla.1998) (holding that it was improper burden shifting for the State to tell the jury, "If you believe his story, he's not guilty. If you believe he's lying to you, he's guilty"). However, in this case, the prosecutor's statements did not imply that Hutchinson had to prove anything in order to establish his innocence. The prosecutor discussed the importance of certain evidence and the State's theory of motive. The prosecutor did not tell the jury that Hutchinson had a burden to prove anything. Thus, Hutchinson has failed to demonstrate that the trial court abused its discretion in overruling defense counsel's objections.
Hutchinson next alleges that the State bolstered the credibility of its witnesses. The State called Deanna and Creighton Adams, Hutchinson's good friends, to identify Hutchinson's voice on the 911 tape. The prosecutor told the jury that Hutchinson's friends had no reason to want to hurt Hutchinson. The prosecutor stated, "They came in here and told the truth even though they were so closely, closely in companionship with Jeff Hutchinson." The defense objected, the trial court overruled the objection, and the prosecutor continued, "Well, you consider the credibility of Deanna Adams and Creighton Adams' testimony. They were his best friends. The only thing that they've ever done to Jeff Hutchinson that hurt him in any way was come here and tell the truth."
Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony. See Gorby v. State, 630 So.2d 544, 547 (Fla.1993) ("It is improper to bolster a witness' testimony by vouching for his or her credibility."). In this case, the State did not place the prestige of the government behind the witnesses' testimony, nor did the State rely on anything outside the record to support the witnesses' statements. See, e.g., Brooks v. State, 762 So.2d 879, 902 (Fla.2000) (finding improper vouching where the the prosecutor's arguments tended to cloak the State's case with legitimacy as a bona fide death penalty prosecution). Thus, Hutchinson has failed to demonstrate that the prosecutor's argument was error.
*954 Hutchinson also argues that the prosecutor vouched for the credibility of the two police officers when he told the jury that Sgt. Michael Stewart and Deputy Daniel Neil Woodward "didn't testify to anything that sounded prejudiced to me." This statement was made in rebuttal to the defense attorney's argument that the officers were already "prejudiced by the 911 calls" when they arrived at Hutchinson's home. The prosecutor did not refer to the officers' honesty or credibility; he merely stated their testimony did not show they were prejudiced by the 911 call, as the defense accused. The trial court did not abuse its discretion in overruling defense counsel's objections on the grounds of improper bolstering or vouching.
Finally, Hutchinson argues that the State made prohibited "golden rule" arguments and argued facts not in evidence. A "golden rule" argument asks the jurors to place themselves in the victim's position, asks the jurors to imagine the victim's pain and terror or imagine how they would feel if the victim were a relative. See Pagan v. State, 830 So.2d 792, 812-13 (Fla.2002). In this case the prosecutor told the jury that Geoffrey saw the rest of his family dead, and that had he been in the bedroom with his family, Geoffrey would have been shot in the head along with them. The prosecutor did not ask the jurors to put themselves in Geoffrey's shoes or to consider how they would feel if Geoffrey were their own son.
Furthermore, the prosecutor did not speculate about what Geoffrey was thinking or create an "imaginary scenario" argument. An "imaginary scenario" argument is a subtle form of the "golden rule" argument that asks the jury to put his or her "own imaginary words in the victim's mouth, i.e., `Don't hurt me. Take my money, take my jewelry. Don't hurt me.'" Urbin v. State, 714 So.2d 411, 421 (Fla.1998). This type of argument is prohibited because it is an attempt to "unduly create, arouse and inflame sympathy, prejudice and passions of [the] jury to the detriment of the accused." Id. (quoting Barnes v. State, 58 So.2d 157, 158 (Fla.1951)).
Here, the prosecutor did not ask the jurors to imagine what Geoffrey must have thought or felt, and he did not argue facts that were not in evidence. The prosecutor simply asked the jurors to draw inferences from the testimony  an inference based on the evidence of Geoffrey's location when he was found, the position of his body, and the location of his blood. "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985); see also Robinson v. State, 610 So.2d 1288, 1290 (Fla.1992). The prosecutor in this case acted properly in asking the jury to make reasonable inferences from the evidence presented at trial. The State did not violate the prohibition against "golden rule" arguments.
Because we find that the trial court did not abuse its discretion in any of the three areas Hutchinson claims trial errors occurred, there are no errors to consider cumulatively. See Roberts, 840 So.2d at 972.

4. Hutchinson's Right to Remain Silent
Hutchinson next argues that the trial court abused its discretion in denying his motion for mistrial when the State's witness, Officer Ashley, told the jury that he spoke with Hutchinson for several hours on the night of the murders. Hutchinson acknowledges that this information was offered as foundation for Ashley's identification of Hutchinson's voice on the 911 tape. However, Hutchinson claims *955 that the effect was a clear comment on Hutchinson's decision not to take the stand in his own defense. He argues that telling the jury that Ashley spoke with him over a six- or seven-hour period on the night of the murder amounts to a comment on his silence at trial since the jury would expect him to testify.
This Court has said that "[c]ommenting on the defendant's exercise of his right to remain silent is serious error." Rimmer v. State, 825 So.2d 304, 322 (Fla.2002). "The test to be applied in such instances is whether the statement is fairly susceptible of being interpreted by the jury as a comment on the defendant's failure to testify." Id. The comment made by the officer in this case does not rise to the level of a comment on the defendant's failure to testify.
Hutchinson talked with the officer and did not invoke his Fifth Amendment privilege against self-incrimination until several hours into the interrogation. The prohibition against commenting on a defendant's silence does not apply when the defendant does not invoke his Fifth Amendment right. See Valle v. State, 474 So.2d 796, 801 (Fla.1985). Ashley's testimony only told the jury that Hutchinson was interviewed by the police. There was no comment about the content of Hutchinson's statement or his refusal or failure to answer any question. A comment by the police on the mere fact of the interview is not a comment on Hutchinson's silence, and is not fairly susceptible to interpretation by the jury as a comment on Hutchinson's silence at trial. Relief on this issue is not warranted.

5. Sufficiency of Evidence of Premeditation
Hutchinson argues there was insufficient evidence to support premeditation. We recently summarized the law on premeditation in Morrison v. State, 818 So.2d 432, 452 (Fla.2002), as follows:
Premeditation may "be formed in a moment and need only exist `for such a time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993) (quoting Asay v. State, 580 So.2d 610, 612 (Fla.1991)). Premeditation can be shown by circumstantial evidence. See Woods v. State, 733 So.2d 980, 985 (Fla.1999). Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. See Cochran v. State, 547 So.2d 928, 930 (Fla.1989). As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.

Sochor v. State, 619 So.2d 285, 288 (Fla.1993) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)).
This Court will generally not reverse the trial court's denial of a motion for judgment of acquittal if there is competent, substantial evidence in the record to support the jury's finding of premeditation. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
In this case, the weapon used was a pump-action shotgun. A pump-action shotgun does not automatically fire one shot after another. It requires the user to pull the pump before aiming and firing each time. Although this gun had a magazine and required no reloading, Hutchinson still had to pump, aim, and fire when he killed Renee. He had to repeat the *956 sequence again before firing upon Amanda, and yet again before firing upon Logan. Because the evidence shows that Geoffrey was not in the bedroom when he was shot, after shooting Renee, Amanda, and Logan, Hutchinson would have had to pump the gun again, turn around, aim and fire upon Geoffrey. He would have had to repeat the sequence again when he shot Geoffrey for the second time.
In addition to Hutchinson's conduct just prior to the shootings, there is competent, substantial evidence that these murders were not the result of a sudden provocation. After arguing with Renee, Hutchinson actually left the home, drove to a bar, drank beer, and then drove back home. The period of time from the argument, which occurred between 7 and 7:30 p.m., to the actual murders, which occurred at approximately 8:30 p.m., was certainly enough time for Hutchinson to become conscious of the nature of the act he was about to commit and the probable result of that act.
The evidence in this case, after being viewed in a light most favorable to the State, is sufficient to sustain a conviction of premeditated first-degree murder. See Pagan, 830 So.2d at 803 ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction."). When considering the time between the argument and the actual murders, as well as the time Hutchinson needed to take between each shooting, a rational trier of fact could find premeditation. There was competent, substantial evidence to find premeditation. Therefore, Hutchinson is not entitled to relief based on this claim.

6. Motion for New Trial
During a trial break, the jurors met for lunch at a nearby restaurant. A patron approached the jurors and told them that she hoped they were sitting on the Hutchinson case and that she hoped they would hang him. Upon returning to the courthouse, a juror told the trial judge about the incident. Two other jurors admitted to hearing the comment. The judge asked the three jurors individually if hearing the patron's comment would affect their ability to serve as jurors on this case. They all said no. Hutchinson argues that prejudice arose from the jury's exposure to the community's hatred toward him, and that the trial judge failed to remedy that prejudice.
Appellate courts review a trial court's ruling on issues involving the jury's exposure to comments or evidence that was not presented in the courtroom on an abuse of discretion standard. "Trial court discretion in ruling on motions for mistrial where jurors have been exposed to outside comments about a defendant or similar offensive references to the case or a party should not be disturbed absent an abuse of discretion." Craig v. State, 766 So.2d 257, 259 (Fla. 4th DCA 2000); cf. Doorbal v. State, 837 So.2d 940, 956 (Fla.) (stating that the standard of review of the trial court's denial of a motion for mistrial is abuse of discretion), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). The trial court in this case did not abuse its discretion in denying Hutchinson's motion for mistrial based on Hutchinson's fear that three jurors were unable to be impartial due to a comment made by a restaurant patron.
This case is similar to Street v. State, 636 So.2d 1297 (Fla.1994). In Street, a person passed the jury in the hallway and muttered, "guilty." Id. at 1301. The trial judge inquired of the jury whether they had heard the statement, individually questioned the four jurors who had heard the comment about their ability to remain *957 impartial, and then denied the defendant's motion for mistrial. This Court affirmed that denial and held that the judge's actions were proper. Id. at 1302; see also Occhicone v. State, 570 So.2d 902, 904 (Fla.1990) (holding that it was not an abuse of discretion to deny a motion for mistrial on the ground that a spectator told a prospective juror during voir dire that she thought the defendant was guilty where the defendant failed to establish that the jury pool had been tainted).
The trial court in this case acted appropriately by questioning the panel and then individually questioning those who heard the comment about their ability to be impartial. The comment made to the jurors amounted to an opinion and not the disclosure of evidence or facts not presented at trial. Further, Hutchinson failed to show that the jurors were not impartial. The trial judge, therefore, did not abuse his discretion, and the denial of Hutchinson's motion for mistrial was proper.

7. The Victim's Age as an Aggravating Factor
At sentencing, the trial court considered the "youth" aggravator, section 921.141(5)(1), Florida Statutes (2000), as it applied to each of the children. This statute allows the sentencer to consider a victim's age as an aggravating factor if the victim is less than twelve years old. Hutchinson argues that the trial court improperly relied on this aggravator because there was no causal link between the children's ages and their deaths. Without such a link, Hutchinson contends, this aggravator does nothing to limit or narrow the class of persons eligible for a death sentence. Although Hutchinson did not object to this aggravating factor below, he argues that relying on this aggravating factor was fundamental error because the error reaches down to the validity of the death sentence, and without such error, a death sentence could not have been obtained.
We have held that an argument attacking the constitutionality of an aggravating factor must be specifically raised at trial to be pursued on appeal. See Morrison v. State, 818 So.2d 432, 455 (Fla.2002); Lukehart v. State, 776 So.2d 906, 925 (Fla.2000) (refusing to address a claim that the "victim under 12" aggravator was unconstitutional because the issue was not preserved for review).[3] Because defense counsel did not preserve this issue for appellate review, we deny relief on this claim and will not address its merits.

8. Aggravated Child Abuse
Hutchinson next argues that the trial court erred in finding as an aggravating circumstance that he committed the murders of the children during the course of a felony, i.e., aggravated child abuse. Any error in the trial court's handling of aggravated child abuse as an aggravating circumstance is harmless because the trial court merged the factors supporting this aggravator with the aggravator that the victim was a person less than twelve years of age. The State filed a cross-appeal in this case alleging that the trial court erred by failing to consider the aggravated child abuse aggravator separately from the aggravating circumstance that the child victims were under the age of twelve at the time of their murders. The trial court properly merged these two aggravators. We therefore deny the State's cross appeal. See Lukehart v. State, 776 So.2d 906, 925 (Fla.2000) (holding that the trial court improperly doubled *958 aggravated child abuse aggravator and "victim under twelve" aggravator because both aggravators relied upon the victim's status as a child).

9. Heinous, Atrocious, or Cruel Aggravating Circumstance
Hutchinson next argues that the trial court erroneously found that the murder of Geoffrey was HAC because there was no evidence that Geoffrey had a prolonged awareness of his impending death or that he suffered mental torture. Our review of a trial court's finding of an aggravating factor is limited to determining whether the trial court applied the right rule of law and, if so, whether competent, substantial evidence supports its finding. See Way v. State, 760 So.2d 903, 918 (Fla.2000). In this case, the trial court correctly found the HAC aggravating circumstance.
The trial court found the following facts in support of HAC. Nine-year-old Geoffrey Flaherty was the fourth victim, and he was first shot in the chest and then shot in the head. The evidence showed that Hutchinson kicked or shoved in the front door, wielding a shotgun. He crossed the living room and entered the master bedroom. Geoffrey was not in the master bedroom at that time. Geoffrey's mother, sister, and brother were in the bedroom and were shot and killed. Geoffrey was standing in the doorway to the bedroom, and he would have heard the gunshots and would have seen each member of his family being shot. Hutchinson then faced Geoffrey, racked another shell into the chamber, aimed the shotgun at Geoffrey, and pulled the trigger. Geoffrey had a defensive wound indicating that he raised his arm to ward off the blast that struck him in the chest. Geoffrey stumbled into the living room, grasping at the arm of the sofa as evidenced by a blood soaked hand print. He fell to the floor in between the sofa and coffee table, looking toward the master bedroom as Hutchinson followed him and fired the last shot through Geoffrey's right ear. This shot went through Geoffrey's head and neck and killed him. The circumstances of the final minutes of Geoffrey's life prove beyond a reasonable doubt that Geoffrey's murder was heinous, atrocious, or[4] cruel.
Hutchinson argues that the facts of this case do not support a finding of HAC because Geoffrey's death was quick and would have occurred not more than five to ten seconds after Geoffrey came to the master bedroom doorway. Hutchinson argues that the instantaneous nature of Geoffrey's killing does not justify HAC. While this Court has held that "an instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious, or cruel," Robinson v. State, 574 So.2d 108, 112 (Fla.1991), we have also indicated that such deaths can satisfy this aggravator if the State has presented other evidence to show some physical or mental torture of the victim. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). An HAC finding will be affirmed even if the victim was killed by a single gunshot wound if the entire sequence of events demonstrates that the victim suffered substantial mental anguish. See, e.g., Henyard v. State, 689 So.2d 239, 254 (Fla.1996) (finding HAC where two children saw their mother shot and raped before they were each killed with a single gunshot wound to the head). In determining whether HAC applies, the *959 trial court considers the circumstances of the murder from the "unique perspective of the victim." Banks v. State, 700 So.2d 363, 367 (Fla.1997). The victim's "[f]ear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous." Preston v. State, 607 So.2d 404, 410 (Fla.1992). Therefore, in determining whether the trial court properly found HAC here, we focus on the victim's perceptions of the circumstances, as opposed to those of the perpetrator. See Farina v. State, 801 So.2d 44, 53 (Fla.2001). Furthermore, "the victim's mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances." Swafford v. State, 533 So.2d 270, 277 (Fla.1988); see also Chavez v. State, 832 So.2d 730, 765 (Fla.2002).
The evidence demonstrates that Geoffrey saw the bodies of his mother, sister, and brother in the blood-spattered room, and a common sense inference from the circumstance is that Geoffrey heard the gunshots that killed his family. Common sense also supports the trial court's finding that Geoffrey saw Hutchinson point the gun at him. Testimony at trial as to where Geoffrey's blood was located and where his body was ultimately discovered, as well as the existence of defensive wounds, supports the trial court's finding that after Geoffrey was initially shot, he attempted to escape. Because Geoffrey was nine years old, common sense tells us he was aware that Hutchinson was going to kill him when he saw his family killed and when Hutchinson pointed the gun at him.
Thus, the finding of HAC is supported by competent, substantial evidence.

10. Proportionality Review
Finally, we find that Hutchinson's sentence of death is proportional. In deciding the proportionality, we must consider the totality of the circumstances and compare the case with other capital cases. See Sexton v. State, 775 So.2d 923, 935 (Fla.2000). This analysis "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Instead, this Court must look to the nature of and the weight given to the aggravating and mitigating circumstances.
The trial court found two statutory aggravators for the murders of Logan and Amanda: (1) the defendant was previously convicted of another capital felony (the other murders), and (2) the victim was less than twelve years of age. See § 921.141(5)(b), (1), Fla. Stat. (2000). Three statutory aggravators were found by the trial court for the murder of Geoffrey: (1) the defendant was previously convicted of another capital felony (the other murders); (2) the victim was less than twelve years of age, which merged with the aggravated child abuse aggravator; and (3) HAC. See id. § 921.141(5)(b), (d), (h), (1).
The trial court found one statutory mitigator: no significant history of prior criminal activity, giving it significant weight. The following nonstatutory mitigators were considered and found: (1) the defendant was a decorated military veteran of the Gulf War, significant weight; (2) the defendant is the father of a son for whom he has provided financial and emotional support, some weight; (3) the defendant has potential for rehabilitation and productivity while in prison, some weight; (4) the defendant was intoxicated with a blood alcohol content of .21 to .26 on the night of the murders, some weight; (5) the defendant was a soldier for eight years and had been honorably discharged, slight weight; (6) the defendant provided financial and emotional support to his family, slight *960 weight; (7) the defendant has the ability to show compassion, slight weight; (8) the defendant has a good employment history, slight weight; (9) the defendant's family supports him, slight weight; (10) the defendant has ability as a mechanic, slight weight; (11) the defendant sought motorcycle patents, slight weight; (12) the defendant was diagnosed with Gulf War illness, minimal weight; (13) the defendant was recognized as security officer of the year, minimal weight; (14) the defendant never abused drugs, little weight; (15) the defendant is a high school graduate, little weight; (16) the defendant was active in disseminating information about Gulf War illness, little weight; (17) the defendant has religious faith, little weight; (18) the defendant was distressed during the 911 call, little weight; (19) the defendant's friends testified on his behalf, very little weight; and (20) the defendant was diagnosed with Attention Deficit Disorder, very little weight. The trial court considered but rejected two statutory mitigators and six nonstatutory mitigators, either finding them to be not mitigating in nature, not proven, or not worthy of any weight.
Hutchinson argues that because he has no history of violence and the multiple murders were domestic in nature, the numerous mitigating factors outweigh the limited aggravation. This Court has rejected and continues to reject any "domestic dispute" exception to the imposition of a death sentence. See Walker v. State, 707 So.2d 300, 318 n. 12 (Fla.1997) (stating that this Court has never treated "domestic dispute" cases as categorically different than other death cases, and the fact that a case is "domestic" in nature is not, in and of itself, mitigating).
This case involves the murders of three defenseless children, all age nine and under, as well as the murder of their mother. For each of these murders, the trial court found either two or three aggravating circumstances, one statutory mitigating circumstance, and several nonstatutory mitigating circumstances. The circumstances of these murders clearly demonstrate that the sentences of death are proportional to other murder cases involving multiple child-victims. In Henyard v. State, 689 So.2d 239, 255 (Fla.1996), we found the death sentence proportional where the defendant killed two young children with a single gun shot to the head, and also shot their mother who survived. The aggravators found in Henyard were prior violent felony, during the course of a felony, pecuniary gain, and HAC; several mitigators were found, including mental mitigators. Likewise in Durocher v. State, 604 So.2d 810 (Fla.1992), we found the death sentence proportional where the defendant killed his former girlfriend and her two small children. We also found the death sentence in Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998), proportional where the defendant killed his wife and two children. The aggravators present in Zakrzewski were previous conviction of violent felony (contemporaneous murders), cold, calculated, and premeditated, and HAC. Significant mitigation was also found in Zakrzewski, including two statutory mitigators and mental health mitigation.
Additionally, this case is similar to the situation we addressed in Henry v. State, 649 So.2d 1361 (Fla.1994). In Henry, the defendant was sentenced to death for the murders of his second wife and her son. The aggravating circumstances found were previous conviction of another capital felony (the murder of Henry's first wife), and that the murder was committed during the course of a kidnapping. There were two statutory mitigating circumstances: extreme mental or emotional disturbance and lack of capacity to appreciate the criminality *961 of his conduct. In addition, there were a number of nonstatutory mitigating factors, including the fact that Henry pled guilty and turned himself in for the murder of his first wife, that he was cooperative with law enforcement, that he had good conduct in jail, that he was a good Christian, that he was truly remorseful, that he had a history of drug and alcohol abuse, and that he fell as a child and suffered some brain injury. Under these circumstances, we found Henry's sentence of death to be proportional. Likewise, under the facts and circumstances in this case, the sentences of death for the murders of three children demonstrate that death is also a proportional sentence.

CONCLUSION
Hutchinson has failed to demonstrate that the trial court committed reversible error during his trial. Therefore, we affirm his convictions of four first-degree murders. We also affirm the imposition of the sentences of death for the murders of the three children.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., concur.
PARIENTE, C.J., concurs in part and concurs in result only in part with an opinion, in which ANSTEAD and CANTERO, JJ., concur.
PARIENTE, C.J., concurring in part and concurring in result only in part.
I concur in the affirmance of the murder convictions and death sentences in this case. I write separately because I disagree with the majority's conclusion that sufficient evidence supports the finding that the murder of Geoffrey Flaherty was especially heinous, atrocious, or cruel (HAC). I conclude that HAC was erroneously found as to this murder.
I begin with the explanatory note that many first-degree murders by definition would initially appear "especially heinous, atrocious or cruel." However, under our death penalty law, the purpose of aggravating circumstances is to determine which murders are set apart from all other murders so as to subject those defendants to the death penalty.
When the circumstances of the murder of Geoffrey Flaherty are viewed objectively and dispassionately, as is our duty, I conclude that these facts fall short of the criteria we have set out for the application of the HAC aggravator. I am concerned that approval of HAC under these facts risks expansion of the aggravator to the point that it no longer provides constitutionally adequate guidance to the sentencer as required by the Eighth Amendment to the United States Constitution.
For HAC to apply, the capital felony must be "especially heinous, atrocious, or cruel." § 921.141(5)(h), Fla. Stat. (2002) (emphasis added); see also Amoros v. State, 531 So.2d 1256, 1260 (Fla.1988) ("First-degree murder is a heinous crime; however, this statutory aggravating circumstance requires the incident to be `especially heinous, atrocious, [or] cruel.'"); Tedder v. State, 322 So.2d 908, 910 (Fla.1975) ("It is apparent that all killings are atrocious.... Still, we believe that the Legislature intended something `especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder."). The HAC aggravating circumstance is directed toward selecting those murders that, because of their heightened depravity, warrant the imposition of this specific aggravating circumstance.
In determining the circumstances in which HAC applies, it is essential to consider the constitutional function served by all of the aggravating factors found in *962 Florida's death penalty statute, including HAC. See § 921.141(5), Fla. Stat. (2002). As Justice Scalia recently observed, "[w]hat compelled [many states] to specify particular `aggravating factors' that must be found before the death penalty can be imposed ... was the line of this Court's cases beginning with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam)." Ring v. Arizona, 536 U.S. 584, 610, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (Scalia, J., concurring). In Furman and subsequent decisions, the United States Supreme Court declared unconstitutional the death penalty statutes existing in most states, including Florida. The Supreme Court held that the death penalty in those states, by leaving too much discretion to the sentencer in deciding whether to impose the death penalty, constituted cruel and unusual punishment under the Eighth Amendment. See Furman, 408 U.S. at 239-40, 92 S.Ct. 2726. In reaction, many states, including Florida, amended their statutes to include certain "aggravating factors" that would supply a "meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." See id. at 313, 92 S.Ct. 2726 (White, J., concurring).
Thus, to pass constitutional muster, all aggravators including HAC must adequately channel and guide the sentencer's discretion in deciding whether to impose death. Because Ring now emphasizes that the jury is the finder of fact as to aggravating circumstances, it is especially important that we continue to promote constitutionally precise guidelines as to what factors support the finding of the HAC aggravator.
Because federal courts defer to this Court's interpretation of Florida law,[5] our construction of the statutory language defining HAC is crucial to its constitutional validity. Just months after the Florida Legislature amended the death penalty statute to conform to Furman, this Court stated with regard to HAC:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
State v. Dixon, 283 So.2d 1, 9 (Fla.1973). Relying on this construction as a limitation of HAC to the "conscienceless or pitiless crime which is unnecessarily torturous to the victim," the United States Supreme Court held in Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), that this definition gave the sentencer adequate guidance in its application. Subsequently, in Sochor v. Florida, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), the Supreme Court rejected an Eighth Amendment challenge to the HAC aggravator, but did so in terms that called into question our HAC jurisprudence:
Sochor contends ... that the State Supreme Court's post-Proffitt cases have not adhered to Dixon's limitation as stated in Proffitt, but instead evince inconsistent and overbroad constructions *963 that leave a trial court without sufficient guidance. And we may well agree with him that the Supreme Court of Florida has not confined its discussions on the matter to the Dixon language we approved in Proffitt, but has on occasion continued to invoke the entire Dixon statement quoted above, perhaps thinking that Proffitt approved it all. See, e.g., Porter v. State, 564 So.2d 1060 (1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); Cherry v. State, 544 So.2d 184, 187 (1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 963 (1990); Lucas v. State, 376 So.2d 1149, 1153 (1979).
But however much that may be troubling in the abstract, it need not trouble us here, for our review of Florida law indicates that the State Supreme Court has consistently held that heinousness is properly found if the defendant strangled a conscious victim.
Id. at 536-37, 112 S.Ct. 2114 (citations omitted). In response to Sochor, this Court clarified that for HAC to apply, "the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim." Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992); see also Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). We have also stated that "[o]nly when a murder evinces extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another is a finding of HAC appropriate." Buckner v. State, 714 So.2d 384, 390 (Fla.1998).
This Court has repeatedly held that HAC applies to murders either by strangulation of a conscious victim, as noted in Sochor,[6] or by repeated stabbing of a conscious victim,[7] because a killing by either method is inherently torturous:
HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference. Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.
Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002) (citations omitted). Thus, only "where" and "if" the killing is inherently torturous  such as in the case of a strangulation or repeated stabbing of a conscious victim  will the defendant's intent or indifference to the victim's suffering be inferred by the very torturous manner of the death.
Applying these criteria, we have disapproved HAC for gunshot murders that are unaccompanied by other circumstances showing that the killing was conscienceless or pitiless and unnecessarily torturous to the victim, i.e., committed in a manner exhibiting utter indifference to or enjoyment of the suffering of another. See, e.g., *964 Diaz v. State, 860 So.2d 960, 967 (Fla.2003) (determining that competent, substantial evidence did not support HAC finding for murder carried out quickly and without intent to inflict a high degree of pain or otherwise torture the victim), cert. denied, ___ U.S. ___, 124 S.Ct. 2068, 158 L.Ed.2d 622 (2004); Rimmer v. State, 825 So.2d 304, 328 (Fla.2002) (finding that evidence did not support HAC where the record did not reveal that the defendant tortured the victims or subjected them to pain and suffering), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002); Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996) ("Execution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim."); Robinson v. State, 574 So.2d 108, 112 (Fla.1991) (holding that the trial court erred in finding HAC because the fatal shot to the victim "was not accompanied by additional acts setting it apart from the norm of capital felonies, and there was no evidence that it was committed `to cause the victim unnecessary and prolonged suffering'"). In fact, we have stated that "a murder by shooting, when it is ordinary in the sense that it is not set apart from the norm of premeditated murders, is as a matter of law not [especially] heinous, atrocious, or cruel." Lewis v. State, 398 So.2d 432, 438 (Fla.1981) (emphasis supplied).
Turning to the facts of this case, I conclude that Geoffrey Flaherty suffered a nearly instantaneous death by gunshot that was not inherently torturous under the standards of our previous opinions. Cf. Rimmer, 825 So.2d at 329 (holding HAC inapplicable where second victim was "killed within a very short time (perhaps only seconds) after [the first victim] and, therefore, would have experienced only a very short period of mental anguish, if any at all"). In these circumstances, both the trial court in finding HAC and this Court in reviewing that finding are obligated to determine whether the defendant committed the killing in an unnecessarily torturous manner that exhibited an utter indifference to or enjoyment of the suffering of the victim. Neither the sentencing order nor the majority opinion in this case reflects such a determination. The trial court found that in firing the fatal shot, Hutchinson acted "without pity, without conscience." This entirely accurate observation does not equate to a finding that the killing was done in an unnecessarily torturous manner. The majority, in approving the trial court's determination, explicitly limits its focus to "the victim's perceptions of the circumstances, as opposed to those of the perpetrator." Majority op. at 28. Accordingly, I believe that in approving the trial court's determination that this murder was HAC without taking into consideration the defendant's intent, the majority has strayed from HAC's Eighth Amendment boundaries.
The majority's exclusive focus on the victim's possible or likely perceptions in its review of the HAC determination in this case perpetuates an error that I have previously commented upon. See Francis v. State, 808 So.2d 110, 144 (Fla.2002) (Pariente, J., concurring in result only) (emphasizing "that a finding of HAC under Dixon and its progeny requires evidence from which it can be inferred that the defendant intended to inflict unnecessary pain or suffering upon the victim, otherwise torture the victim, or exhibit indifference to the suffering of another"). Justice Harding has articulated a similar concern in a case in which we struck HAC for an "execution-style" killing:
If we approved the application of the HAC aggravating factor in the instant case without some factual proof of the victims' mental torture, then the factor *965 would apply in every instance where a normal person might feel fear. This would exclude only those homicides where the victim was ambushed or killed without awareness of the assailant. This clearly would go far beyond finding the HAC factor to be "appropriate in a `conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" Richardson, 604 So.2d at 1109 (quoting Sochor v. Florida, 504 U.S. 527, 536, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992)). I believe that such a broad interpretation of the HAC aggravating factor would render it unconstitutional because it would not provide the sentencer with adequate guidance. See Sochor, 504 U.S. at 536, 112 S.Ct. 2114, 119 L.Ed.2d 326.
Knight v. State, 746 So.2d 423, 439 (Fla.1998) (Harding, C.J., specially concurring). In my view, the majority fails to heed Justice Harding's admonition against a broad interpretation of the aggravator and makes concrete the concern that the Supreme Court in Sochor found "troubling in the abstract."
Applying the constitutionally required criteria for HAC, I cannot conclude that the killing of Geoffrey, although appalling, was especially heinous, atrocious, or cruel. There are of course two distinctions between this killing and the killings of the other three victims, which the trial court did not find to be HAC. First, Geoffrey was killed last, and second, because Geoffrey resisted his fate and attempted to flee, Hutchinson was required to pursue him and fire a second shot in order to consummate the murder. In comparison to the cases in which we have upheld HAC for gunshot killings, however, the circumstances of this murder do not support a conclusion that this was an unnecessarily torturous killing.[8] Rather, this case belongs in the category of execution-style killings of a subsequent victim that fall short of the criteria of HAC. See Rimmer, 825 So.2d at 329 (concluding that evidence was insufficient to support HAC as to second victim because record did not show that the defendant "acted with extreme and outrageous depravity or that he inflicted a high degree of physical or mental pain"). Although Geoffrey undoubtedly suffered both mental and physical anguish, I conclude that as in Rimmer, id., the terror of his final moments did not constitute the "longer and significantly more protracted suffering" that is necessary for HAC.
*966 Under Dixon and its progeny, HAC requires evidence from which it can be inferred that the defendant intended to inflict unnecessary pain or suffering upon the victim, otherwise torture the victim, or exhibit indifference to the suffering of another. The record is devoid of evidence upon which to conclude that Hutchinson intended to inflict unnecessary pain or suffering, or exhibited utter indifference to or enjoyment of Geoffrey's suffering. Rather, it appears that Hutchinson acted with ruthless efficiency in carrying out the execution of his family members, from the beginning of this murderous episode to its conclusion. The manner of the killing would lend support to the aggravator of cold, calculated, and premeditated (CCP), which the trial court did not find, but does not support the trial court's determination that the murder was HAC. I would therefore strike HAC as to the murder of Geoffrey.
Nonetheless, I concur in the affirmance of the death sentence because I conclude that the trial court's error in finding the HAC aggravator for the murder of Geoffrey is harmless beyond a reasonable doubt and does not render death a disproportionate penalty. Under the circumstances of this case, there is no reasonable possibility that the trial court would have concluded that the two remaining aggravating factors of previous conviction of a capital felony (the other murders) and murder of a victim less then twelve years of age were outweighed by the single statutory mitigator of no significant criminal history and the twenty nonstatutory mitigating factors, the vast majority of which were given "little," "very little," "slight" or "minimal" weight. Therefore, any error in finding HAC was harmless beyond a reasonable doubt. See Wright v. State, 857 So.2d 861, 879 (Fla.2003) (finding trial court's reliance on an unsupported aggravator to be harmless error where elimination of the aggravator creates "no likelihood of a different sentence"), cert. denied, ___ U.S. ___, 124 S.Ct. 1715, 158 L.Ed.2d 402 (2004); Gore v. State, 599 So.2d 978, 987 (Fla.1992) (concluding beyond a reasonable doubt that error in finding aggravator was harmless because trial court would have imposed death without consideration of invalid aggravator). I also conclude that, as with the sentences for the murders of his siblings, death was a proportionate punishment for the murder of Geoffrey Flaherty in comparison to other, analogous cases in which we have affirmed sentences of death.
ANSTEAD and CANTERO, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993). At a Spencer hearing the defendant is allowed to present additional mitigating evidence to the trial judge.
[2] Even if the issue were not barred, it would be without merit. See Kearse v. State, 662 So.2d 677 (Fla.1995) (upholding a similar special instruction).
[3] It should be noted that although the trial court found the "under the age of 12" aggravator to exist as to the murders of Geoffrey, Amanda, and Logan, in each instance, that aggravator was merged with the "aggravated child abuse" aggravator.
[4] While the sentencing order uses the conjunction "and," the statute provides that this aggravating factor is applicable if the murder "was especially heinous, atrocious, or cruel." § 921.141(5)(h), Fla. Stat. (2000) (emphasis added).
[5] See Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n., 426 U.S. 482, 488, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) ("We are, of course, bound to accept the interpretation of [the State's] law by the highest court of the State.").
[6] See also Barnhill v. State, 834 So.2d 836, 850 (Fla.2002), cert. denied, 539 U.S. 917, 123 S.Ct. 2281, 156 L.Ed.2d 134 (2003); Mansfield v. State, 758 So.2d 636, 645 (Fla.2000); Orme v. State, 677 So.2d 258, 263 (Fla.1996).
[7] See, e.g., Duest v. State, 855 So.2d 33, 46-47 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004); Francis v. State, 808 So.2d 110, 134 (Fla.2001), cert. denied, 537 U.S. 1090, 123 S.Ct. 696, 154 L.Ed.2d 635 (2002); Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998).
[8] See Lynch v. State 841 So.2d 362, 371 (Fla.) (concluding that the thirteen-year-old victim "surely experienced terror at the thought of her own impending death" while being held at gunpoint for thirty to forty minutes and after witnessing her mother being shot numerous times), cert. denied, ___ U.S. ___, 124 S.Ct. 189, 157 L.Ed.2d 123 (2003); Henyard v. State, 689 So.2d 239 (Fla.1996) (finding HAC where victims witnessed rapes and shooting of their mother before victims were driven to another location and shot); Douglas v. State, 575 So.2d 165 (Fla.1991) (finding HAC where defendant "said he felt like blowing our ... brains out," forced the victim to perform various sexual acts at gun point and, during the attempt to comply, fired the rifle into the air, and hit victim so forcefully in the head with the rifle that the stock shattered, before shooting victim in the head); Parker v. State, 476 So.2d 134 (Fla.1985) (finding HAC where defendants told victim she would be killed so that she could not identify them, victim pleaded during "13-mile death-ride" not to be hurt, victim's bladder was completely voided "consistent with her being in great fear prior to her death," victim had large chunks of her hair torn out by the roots, and was stabbed in the stomach before being shot execution-style); Routly v. State, 440 So.2d 1257 (Fla.1983) (finding HAC where victim was bound during robbery, carried from his own house, thrown into trunk of his own car, and driven out of town through back roads in middle of night before being shot).