[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14778

_____

D.C. Docket No. 6:15-cv-00321-PGB-GJK

RICARDO VEGA,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 28, 2021)

Before MARTIN, LUCK, and BRASHER, Circuit Judges.

LUCK, Circuit Judge:

Ricardo Vega robbed an Orlando area Mexican restaurant with a ball bearing

("BB") gun.  A Florida jury convicted Vega of robbery with a deadly weapon.  After

his conviction was affirmed on direct appeal, Vega claimed that his trial counsel was constitutionally ineffective for failing to move for a judgment of acquittal because, under the Florida courts' interpretation of the robbery statute, the state did not prove that the BB gun Vega used to rob the restaurant was a deadly weapon. The state habeas court denied Vega's ineffective assistance of counsel claim because the evidence was sufficient to find that the BB gun was a deadly weapon, and thus, trial counsel could not have been ineffective under Strickland v. Washington, 466 U.S. 668 (1984) for failing to move for a judgment of acquittal on that basis. The district court concluded that the state habeas court's determination that trial counsel was not ineffective was not contrary to, and was not an unreasonable application of, Strickland. After appointing counsel, reviewing the state court record and the briefs, and hearing oral argument, we agree and affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### *The robbery and Vega's arrest*

On the evening of September 27, 2005, law enforcement officers were watching Jalapeno's Restaurant in Orange County, Florida because it had been robbed the week before. While the officers were watching, Detective Brisinte saw a Hispanic man put on a black ski mask, pull out a handgun from his waistband, and enter the restaurant. The Hispanic man came out of the restaurant a short time later, took off his mask, and ran behind the building. There, he ran into Detective Fink.

2

But Det. Fink wasn't able to arrest the Hispanic man because he ran away into the nearby woods. Det. Brisinte ran after the Hispanic man but couldn't find him.

One of the victims inside Jalapeno's called 9-1-1. The victim told the 9-1-1 operator that someone wearing a black ski mask pointed a semi-automatic handgun at her and demanded money. In fear for her life, the victim gave the masked man $200 from the cash register.

A few days later, Detective Funk helped with the investigation of an armed home invasion robbery in Orange County. Law enforcement officers arrested Ricardo Vega for using a black BB gun, which looked like a semi-automatic handgun, in the home invasion. Det. Funk sent Vega's picture to Det. Brisinte and Det. Fink. Det. Brisinte and Det. Fink were one-hundred-percent sure that Vega was the Hispanic man that they tried to arrest for the Jalapeno's robbery.

### The trial

Vega was charged with robbery with a deadly weapon.[1] The information alleged that Vega "by force, violence, assault or putting in fear," took money from Azucena Zoriano "with the intent to temporarily or permanently deprive" her of the

---

[1] Vega was also charged with aggravated assault with a deadly weapon and resisting arrest without violence, but those charges are not relevant to this appeal. The state dismissed the aggravated assault charge, the jury found Vega guilty of resisting arrest without violence, and he was sentenced 364 days in the county jail, which was less than the time he had already served.

"right to the property . . . and in the course of committing said robbery," Vega carried "a deadly weapon, to-wit: a BB gun or handgun."

At trial, the victim, Ms. Zoriano, testified that she was working at Jalapeno's on September 27, 2005—the night of the robbery. She headed over to one of the tables when a man with a mask entered the restaurant with a real-looking gun in his hand. The masked man pointed the gun at Ms. Zoriano and told her to "give me the money." Afraid that he was going to shoot her, Ms. Zoriano went to the cash register, took out the money, and put it in a bag that the masked man had placed on the counter. While he was waiting for Ms. Zoriano to put the cash register money in the bag, the masked man demanded money from a customer standing by the register. But the customer said he didn't have any money, so the masked man took the bag with the cash register money and headed for the back of the restaurant. Ms. Zoriano couldn't identify the robber because of his mask.

Det. Brisinte testified that he was in the Jalapeno's parking lot on the night of September 27, 2005. Det. Brisinte saw a Hispanic man pace back and forth in front of the restaurant and look inside "several times." Then, the Hispanic man went to the front door, pulled down his hat into a ski mask with holes, took out what appeared to be a firearm, and pointed it at the folks inside the restaurant. Det. Brisinte saw the people inside the restaurant dive for cover. The masked man then went to the cash register and pointed the gun at Ms. Zoriano. The masked man took "what

4

appeared to be money" and then walked out the front door. He put the gun in a bag, lifted the ski mask so it looked like a hat, and walked away towards the back of the restaurant. Det. Brisinte identified Vega as the masked man. Det. Fink, who was also with Det. Brisinte in the parking lot, approached Vega but Vega ran into a nearby wooded area. Det. Brisinte went into the woods but he didn't find Vega.

Det. Fink testified that he was behind the restaurant during the robbery. He was wearing a "smock" that said "sheriff" in large white letters across the front. When the robber left the restaurant and walked behind the store, Det. Fink confronted him with his department-issued shotgun and yelled "police, stop." The robber—holding the money bag—kept walking and then ran to the wooded area behind the restaurant. Det. Fink identified Vega as the man he confronted behind the restaurant after the robbery.

A week or so after the robbery, Det. Fink interviewed Vega. When Det. Fink walked into the interview room, Vega was nervous and wouldn't look at him. Det. Fink asked if Vega remembered him because he had a shotgun in Vega's face on the night of the robbery. Vega said, "I don't know, I'm on drugs, I was on drugs, I don't remember." When Det. Fink asked again if Vega remembered him, Vega jumped up and screamed for a correctional officer to "come and take him out of" the interview room.

5

After the state rested, Vega's trial counsel moved for a judgment of acquittal. He argued that the evidence was insufficient because only one witness, Det. Brisinte, identified Vega as the robber. The other witnesses either didn't see the robbery or couldn't identify Vega because the robber was wearing a mask. The state trial court denied the judgment of acquittal motion because Det. Brisinte saw Vega rob Jalapeno's and it was for the jury to determine his credibility. As to "each one of the elements" of robbery with a deadly weapon, the state trial court said, "there is something that has been said about them that the jury may interpret in the light most favorable to the state."

At the end of the state's rebuttal case, Vega's trial counsel renewed his judgment of acquittal motion. The state trial court denied the renewed motion because there was evidence that, if the jury believed it, would support a conviction for robbery with a deadly weapon.

The jury found Vega guilty of robbery with a deadly weapon as charged in the information. The state trial court sentenced Vega to life imprisonment. The state appellate court affirmed Vega's conviction and sentence.

*Postconviction motion*

Vega moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. Vega claimed that his trial counsel "was ineffective in failing to [move] for judgment of acquittal as to the robbery verdict, when the [s]tate failed to

6

introduce at trial the BB gun alleged by the charging information."[2]  The state, Vega argued, "offered no proof to show that the BB gun is a deadly weapon" and "Florida law does not provide that a BB gun is a deadly weapon."  If a "BB pistol is not introduced at trial," Vega continued, "where it may be inspected and tested by the jury a conviction for robbery with a deadly weapon will not be sustained."  His trial counsel, Vega said, "should have moved for judgment of acquittal in this matter as reasonable jurists would conclude that a BB gun is not a deadly weapon."  "[T]here stands a reasonable probability that had counsel moved for a judgment of acquittal as to the robbery verdict based on the foregoing the motion would have been granted, or if denied, the issue preserved for appellate review supported by substantial case law that would warrant reversal."

The state habeas court denied Vega's claim that his trial counsel was ineffective for failing to move for a judgment of acquittal because the state offered no proof that the BB gun was a deadly weapon and the BB gun was not introduced at trial and could not be inspected by the jury.  The state habeas court found that Vega was charged with using a BB gun to commit the Jalapeno's robbery, rather

---

[2]  Vega also claimed that his trial counsel was ineffective for:  delaying the case; not investigating alibi witnesses; not investigating fingerprint and video evidence; not investigating eyewitnesses; not objecting to the state's leading questions and finger pointing; failing to move for a mistrial after improper questioning; and failing to object to improper closing argument.  But these postconviction claims were denied by the state habeas court and they are not at issue in this appeal.

than a firearm, because "he was caught with a BB gun 'replica' of a semiautomatic pistol when committing a home invasion robbery three days later."

As to Vega's claim that his trial counsel should have moved for a judgment of acquittal because the state offered no proof to show that the BB gun was a deadly weapon, the state habeas court found that "[t]he testimony at trial was sufficient to convict of robbery with a deadly weapon." The state habeas court pointed to Ms. Zoriano's testimony, "[w]hen asked if the gun appeared real," that, "I believe it was, yes." And the state habeas court relied on Det. Brisinte's testimony that he was familiar with firearms and the gun Vega used during the robbery "appeared to be a firearm"—"a regular gun that shoots bullets."

As to Vega's claim that trial counsel was ineffective because a judgment of acquittal motion should be granted where the state does not introduce the BB gun for the jury to inspect and test, the state habeas court found that "[t]here is no requirement that a firearm or deadly weapon be introduced into evidence before convicting of robbery with a firearm or deadly weapon." The state appellate court affirmed the denial of Vega's ineffective assistance of counsel claim.

After the denial of his postconviction motion, Vega petitioned the federal district court for a writ of habeas corpus under 28 U.S.C. section 2254. Like he did in his state postconviction motion, Vega claimed that his trial counsel was

8

ineffective for "fail[ing] to move for judgment of acquittal based on the [s]tate's failure to introduce [the] BB pistol into evidence."

Vega alleged that he was arrested a few days after the Jalapeno's robbery "for a non-related home invasion robbery" and "a BB pistol was recovered as evidence." The state, Vega said, charged him with the Jalapeno's robbery "based on the premise [that] the recovered BB gun had been used in the robbery, and it qualified as a deadly weapon." Vega conceded that "[u]nder Florida law, a BB gun can, in some circumstances, be a deadly weapon" if it "is likely to produce death or great bodily harm." "[T]he determination of the deadliness of the BB gun is a factual issue" and "this determination by the jury must be made after" it has "had the opportunity to view the weapon first hand." At Vega's trial, "[t]he [s]tate showed the jury pictures of the recovered BB gun, but did not provide them the opportunity to view or examine the BB pistol itself." "The jury," Vega argued, "made a factual determination [that] the BB gun was a deadly weapon without competent substantial evidence based on their first hand viewing of the weapon."

Vega contended that his trial counsel "should have moved for a judgment of acquittal (JOA) on the charge of robbery with a firearm or deadly weapon at the conclusion of the [s]tate's case-in-chief, and prior to the jury entering deliberations," because "the [s]tate[] fail[ed] to produce the BB gun as evidence and allow the jury to determine if the BB pistol was a deadly weapon." Trial counsel's failure to move

for a judgment of acquittal on this ground was "deficient" and "prejudiced" Vega because he would have been found guilty only of robbery with a weapon, which is "a less onerous crime" with a maximum sentence of thirty years rather than life.

The district court concluded that the state habeas court's denial of Vega's ineffective assistance of counsel "claim was not contrary to, or an unreasonable application of, Strickland" because the district court could not "say that counsel's actions amount[ed] to deficient performance or that but for counsel's actions, the result of the proceeding would have been different."  Vega, the district court continued, had "not demonstrated that a motion for a judgment of acquittal would have been granted."

The district court explained that Vega had not shown that a judgment of acquittal motion would have been granted because, under Florida law, a "jury can conclude that a weapon is either dangerous or deadly if it is implied by the defendant's words or actions."  "Florida law does not require the introduction of the weapon into evidence."

In Vega's case, the district court said, Vega's words and actions showed that the BB gun was dangerous or deadly, even though it was not introduced into evidence.  Ms. Zoriano testified that Vega pointed what looked like a real gun at her and demanded money.  Det. Brisinte also testified that Vega pointed his gun at the

people inside the restaurant. He was familiar with firearms and, to him, Vega's gun "appeared to be regular gun that shot bullets."

The district court concluded that "[t]his testimony was sufficient to submit the issue to the jury." "Florida law allows for a case to be submitted to the jury in these circumstances," the district court explained, because "the testimony indicated that the defendant implied that the weapon was deadly or dangerous and that he would use it against the victim."

The district court found that Vega was not entitled to a certificate of appealability because he had not made a substantial showing that he had been denied a federal constitutional right. We granted a certificate of appealability to address "[w]hether the district court erred in denying Vega's claim that his counsel was ineffective for failing to move for a judgment of acquittal because the weapon used during the robbery was a BB gun."

**STANDARD OF REVIEW**

Vega's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996. See Mendoza v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1213, 1234 (11th Cir. 2014). Because "state courts are adequate forums for the vindication of federal rights," the Act "ensure[s] that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system[], and not as a means of error correction." Id. (citations omitted).

11

The Act allows a federal court to grant habeas relief only where the state habeas court's decision was:   (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3] 28 U.S.C. § 2254(d). "An unreasonable application of clearly established federal law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case." Terrell v. GDCP Warden, 744 F.3d 1255, 1261 (11th Cir. 2014) (internal quotation marks omitted) (alterations adopted).  "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410 (2000).  "[T]he ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." Virginia v. LeBlanc, 137 S. Ct. 1726, 1728 (2017) (internal quotations omitted). "Therefore, we must deny federal habeas relief as long as some fairminded jurists could agree with the state court's decision, although others might disagree." Terrell, 744 F.3d at 1261 (internal quotation marks omitted).

---

[3] We evaluate "the highest state-court decision that evaluated the claim on the merits." Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016) (internal quotation marks omitted).  Because the state appellate court here affirmed without an opinion, we "look through" it to the rationale of the postconviction court, presume the appellate court adopted its reasoning, and evaluate that decision. See Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

Where a convicted defendant claims ineffective assistance of counsel, the relevant clearly established federal law is Strickland.  See Marshall, 828 F.3d at 1285.  Under Strickland's two-pronged test, the defendant must show both that: (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense."  466 U.S. at 687.  A conviction will be reversed only where there has been "so serious" an error by counsel that it resulted in "a breakdown in the adversary process that renders the result unreliable."  Id.

"Where the highly deferential standards mandated by Strickland and [the Act] both apply, they combine to produce a doubly deferential form of review that asks only whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Terrell, 744 F.3d at 1262 (quotation marks omitted).  "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Mendoza, 761 F.3d at 1236 (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).  "If there is any reasonable argument that counsel satisfied Strickland's deferential standard, then a federal court may not disturb a state court decision denying the claim."  Id. (quotation omitted).

13

## DISCUSSION

Vega contends that the state habeas court unreasonably applied Strickland's performance prong by finding that his trial counsel was not ineffective for failing to move for a judgment of acquittal based on the state's failure to present competent substantial evidence under Florida law that the BB gun was a deadly weapon. The state habeas court, Vega argues, "ruled based on two statements that the victim and law enforcement officer thought the gun was real, with no evidence about the [BB] gun's likelihood to produce any harm at all, and without the gun even coming into evidence despite being in the custody of the prosecution." "This," Vega says, "was patently unreasonable based on then existing Florida law."

Vega's "argument that the state court unreasonably applied Strickland obviously depends upon our determining [trial counsel's] performance was deficient, but first we would have to conclude the state court misinterpreted state law, i.e."—what, under Florida law, is competent substantial evidence to show that a BB gun is a deadly weapon as that term is used in the robbery statute. See Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005). This is because, under Florida law, a conviction is legally sufficient and survives a motion for a judgment of acquittal where it is "supported by competent, substantial evidence." Johnson v. State, 238 So. 3d 726, 739 (Fla. 2018). "Deadly weapon" is not defined in the robbery statute. See Mitchell v. State, 698 So. 2d 555 (Fla. Dist. Ct. App.), approved,

14

703 So. 2d 1062 (Fla. 1997) ("The robbery statute does not define" "weapon," "deadly weapon," or "firearm."). Instead, it has been defined by the Florida courts. See Dale v. State, 703 So. 2d 1045, 1047 (Fla. 1997) (Dale II) (quoting the definition of "deadly weapon" from caselaw).

"[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [trial] counsel failed to raise turns on state law." Pickney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017) (citation omitted). Where the Florida courts "already ha[ve] told us how the issues would have been resolved under Florida state law had [trial counsel] done what [Vega] argues he should have done," "federal habeas courts should not second-guess them on such matters." Herring v. Sec'y, Dep't of Corrs., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (quotation omitted).

Vega's ineffective assistance of counsel claim turns on a question of Florida law: the special state-court created rules for proving that a BB gun is a deadly weapon under the robbery statute. As Vega explains, the state habeas court "concluded under Florida law that the statements made by the lay robbery victim [Ms. Zoriano] and the law enforcement witness [Det. Brisinte] that they thought the replica [BB] gun looked like a real gun was competent and substantial enough to show that the gun was likely to cause death or great bodily harm." The state

15

appellate court affirmed the state habeas court's conclusion. Having concluded that Ms. Zoriano and Det. Brisinte's testimony was sufficient under state law to show that the BB gun was a deadly weapon, we should not second-guess state courts on determinations of state law.

Vega essentially argues, by citing other Florida cases, that the state habeas court misinterpreted Florida law and trial counsel was ineffective based on a correct reading of state law. The petitioner in Pickney made the same argument. 876 F.3d at 1299 (["Petitioner] says, in effect, that the state appellate court was wrong not to recognize the error as fundamental."). But we said the petitioner's argument "fail[ed]" because the issue was one "of state law, and state law is what the state courts say it is. . . . [I]t is not a federal court's role to examine the propriety of a state court's determine of state law." Id.; see also Callahan, 427 F.3d at 931–32 (rejecting the argument that a "state court misinterpreted state law" and deferring to an Alabama court's interpretation of a state-court created double jeopardy rule).

Here, too, Vega's argument that the state habeas court unreasonably applied Florida law fails. The state habeas court and state appellate court have told us that Ms. Zoriano and Det. Brisinte's testimony was sufficient under state law for the jury to find that the BB gun was a deadly weapon. Just as in Pickney, it is not our role to examine the propriety of their determination of state law.

Put another way, under the federal habeas statute, 28 U.S.C. section 2254(d)(1), our review is limited to determining whether the state courts reached a result contrary to or involving an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .").  The state habeas court's decision that Vega's trial counsel was not ineffective—because the evidence at trial was sufficient for the jury to find that the BB gun was a deadly weapon—rests on its interpretation of Florida law.  It does not conflict with or unreasonably apply any federal law.

But even if we could review the state habeas court's determination that trial counsel was not ineffective because the evidence was sufficient under Florida law to prove that the BB gun was a deadly weapon, applying Strickland and AEDPA double deference, Vega has failed to show that no fairminded jurist could agree with the state habeas court's conclusion.  At the time of Vega's trial, the state appellate courts had found similar evidence in BB gun cases to be sufficient proof of robbery with a deadly weapon.

17

For example, in Mitchell, the defendant, "while armed with a BB pistol that appeared to be a firearm . . . went to the home of his estranged wife," but "[a]nother man was at the house." 698 So. 2d at 557. The defendant "entered the house without permission. He pulled the BB pistol from his jacket and threatened to kill both his wife and her friend. He took money from his wife and attempted to take money from the man." Id.

The defendant was charged with, and convicted of, robbery with a deadly weapon. Id. Reviewing the sufficiency of the evidence on appeal, the Mitchell court set out two critical components of Florida law. First, whether a BB gun is a deadly weapon tends to be a factual question for the jury. See id. at 560 ("Case law considering the status of BB guns tends to make the deadliness or dangerousness of a BB gun a factual question for the jury."). And second, evidence is sufficient to convict for armed robbery even if the jury doesn't have the BB gun. See id. at 559 ("In this case, numerous witnesses testified that [the defendant] committed crimes while carrying what they thought was a firearm. If [the defendant] had discarded his gun between the events at the chiropractor's office and his arrest at the mobile park, such evidence may have been sufficient to support convictions involving firearms.").

The jury doesn't need the BB gun because its deadliness is assessed "from a reasonable victim's perceptive and not from the perspective of the defendant." Id. at 562. "[R]eliance upon a victim's perspective," the Mitchell court explained, "is a

18

correct application of the law." Id. Because the defendant's "words and actions . . . implied that the gun was loaded and operable," and "[n]othing visible to any victim in this case would lead any rational person to conclude that the BB gun was not a loaded and operable, deadly or dangerous weapon," the state appellate court concluded that the evidence was sufficient. Id.

Importantly, for our purposes, the Mitchell court certified a question of great public importance to the Florida Supreme Court: "If the state fails to prove that a BB pistol is loaded and operable at the time of an offense, can it be classified as a dangerous or deadly weapon when the defendant's actions cause the victim to reasonably believe that the BB pistol is loaded and operable?" Id. at 557. The Florida Supreme Court "approve[d]" the Mitchell decision because "whether a BB gun—loaded or unloaded—is a deadly weapon is a jury question." Mitchell v. State, 703 So. 2d 1062, 1062 (Fla. 1997).

Also, in Dale v. State, 669 So. 2d 1112 (Fla. Dist. Ct. App. 1996), the defendant had been convicted of robbery with a deadly weapon after robbing a bakery with a BB gun. Id. at 1112–13. He argued on appeal "that under the facts of the instant case the evidence was legally insufficient to establish that [his] use of a BB gun met the statutory definition of a deadly weapon." Id. at 1112. Relying on an earlier decision, Gooch v. State, 652 So. 2d 1189 (Fla. Dist. Ct. App. 1995), the state appellate court held that the "trial court correctly presented this issue to the

jury" because "whether an air or gas operated gun is a deadly weapon depends on the manner in which it is used, and whether it will be classified as a deadly weapon is a question for the jury." Dale, 669 So. 2d at 1113 (cleaned up). But the court acknowledged "some confusion in the case law." Id.

The Florida Supreme Court cleared up the confusion in its Dale II decision. The Florida Supreme Court approved the state appellate court's decision. Dale II, 703 So. 2d at 1046. "The issue," the Court explained, "is whether the 'deadliness' of a BB gun is properly a jury question, or whether a BB gun is so innocuous that it is always a non-deadly weapon as a matter of law." Id. at 1047. The Florida Supreme Court said that "pertinent caselaw" from the state appellate courts showed that they "have overwhelmingly concluded that a BB or pellet gun can be a deadly weapon, and that the issue of 'deadliness' is a jury question." Id. The Court agreed with the "overwhelming" authority from the lower courts and held "that whether a BB or pellet gun is a deadly weapon—i.e., whether it is likely to produce death or great bodily injury—is a factual question to be answered by the jury in each case." Id. (quotation omitted).

Based on Mitchell and Dale, fairminded jurists would conclude, as the state habeas court did, that trial counsel was not ineffective for failing to move for a judgment of acquittal because the evidence was sufficient to show that Vega's BB gun was a deadly weapon. The state habeas court, following Mitchell and Dale,

20

focused on the manner in which Vega used the BB gun and his words and actions during the robbery. The state habeas court cited Ms. Zoriano's testimony that Vega had a gun in his hands and pointed it at her. She testified that she was afraid that he would shoot her. And that, because of her fear, she followed his orders and gave him the money in the register. As in Mitchell, the state habeas court assessed "the likelihood of injury from [Ms. Zoriano's] perspective." 698 So. 2d at 562. When asked, "Did the gun appear real to you?," Ms. Zoriano answered, "I believe it was, yes." Like the Mitchell victim, Vega's victim believed that the gun was real.

The state habeas court also cited Det. Brisinte's testimony. Det. Brisinte saw the robbery from his car in the parking lot and testified that Vega "[p]roduced a firearm, started pointing his gun at people. People went to the ground. He went to the cash register, held the gun to the cash register, a person was at the cash register . . . ." Vega's gun also "appeared to be" a regular gun that, in Det. Brisinte's view, shot bullets.

"With both words and actions," Vega "implied that the gun was loaded and operable. Nothing visible to any victim in this case would lead any rational person to conclude that the BB gun was not a loaded and operable, deadly or dangerous weapon." Id. To the Mitchell court, "this evidence [was] sufficient to support" the robbery with a deadly weapon conviction. Id. And if the evidence was sufficient, at the very least, there's a reasonable argument that counsel satisfied Strickland's

21

deferential standard by not raising a judgment of acquittal motion that would have been denied.

Vega argues that the evidence in Dale II, which the Florida Supreme Court found to be sufficient, was stronger than the evidence in his case. There's no doubt that it was. But Dale did not, and could not, hold that the evidence in this case was insufficient. Indeed, the Florida Supreme Court approved the state appellate court's decision that "whether an air or gas operated gun is a deadly weapon depends on the manner in which it is used, and whether it will be classified as a deadly weapon is a question for the jury." Dale, 669 So. 2d at 1113. The Florida Supreme Court agreed that "whether a BB or pellet gun is a deadly weapon—i.e., whether it is likely to produce death or great bodily injury—is a factual question to be answered by the jury in each case." Dale II, 703 So. 2d at 1047 (cleaned up; emphasis added). Here, the manner in which Vega used the gun—pointing it at the cashier and the restaurant customers, demanding money, and taking the money—was sufficient to create a reasonable belief in his victims that the gun was a real one that would likely cause death or great bodily harm.

Vega also argues that the state appellate courts in Jones v. State, 869 So. 2d 1240 (Fla. Dist. Ct. App. 2004) and E.S. v. State, 886 So. 2d 311 (Fla. Dist. Ct. App. 2004) reversed robbery with deadly weapon convictions because the evidence was

insufficient that the BB guns used in those robberies were deadly weapons.[4]  But in both cases the undisputed evidence was that the BB guns were not deadly weapons. In Jones, "the only evidence of the BB gun's capacity to inflict injury was the [defendant]'s testimony that the gun 'couldn't hurt a fly.'"  869 So. 2d at 1242.  And, in E.S., "[t]he evidence showed that the gun had no cartridge in it and could not discharge pellets."  886 So. 2d at 213.

Here, unlike in those cases, the only reasonable inference from the evidence was that Vega's BB gun was a deadly weapon.  With Vega's "words and actions, he implied that the gun was loaded and operable."  See Mitchell, 698 So. 2d at 562. And "[n]othing visible to [Ms. Zoriano] in this case would lead any rational person to conclude that the BB gun was not a loaded and operable, deadly or dangerous weapon."  See id.  Just as it was in Mitchell, "this evidence is sufficient to support" the robbery with a deadly weapon conviction.  See id.

---

[4]  Vega also relies on K.C. v. State, 49 So. 3d 841 (Fla. Dist. Ct. App. 2010).  But K.C. isn't helpful because it was decided well after the 2007 trial.  The question for the state habeas court was whether trial counsel's decision was deficient in 2007.  Decisions discussing Florida law after 2007 aren't helpful to whether trial counsel was ineffective in 2007.  See Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); Davis v. Singletary, 119 F.3d 1471, 1476 (11th Cir. 1997) ("It was not professionally deficient for [counsel] to fail to anticipate that the law in Florida would be changed in the future to bar the admission of" certain evidence); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.") (cleaned up).

23

In any event, Vega's argument misses the point. Applying the double deference due to the state habeas court's determination that the evidence was sufficient—and thus, trial counsel was not ineffective for failing to move for a judgment of acquittal—our review is limited to whether a fairminded jurist could agree with the state court's decision, although others might disagree. Even if Jones and E.S. supported Vega's position (they don't), Dale and especially Mitchell do not.

## CONCLUSION

For these reasons, we affirm the district court's conclusion that the state habeas court's determination that Vega's trial counsel was not ineffective was not contrary to, or an unreasonable application of, Strickland.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in the result:

In this appeal, Ricardo Vega asks us to review his claim that his trial counsel was ineffective because she did not seek a judgment of acquittal ("JOA") based on the state's failure of proof on the issue of whether the weapon Vega was charged with using during a robbery was a deadly weapon under Florida law. My review of the record persuades me that the postconviction court gave short shrift to Mr. Vega's claim. On the one hand, it acknowledged that the weapon attributed to Mr. Vega was a "BB gun 'replica' of a semiautomatic pistol." On the other, the court showed no concern that the only evidence the jury heard was that Mr. Vega possessed a "gun" or a "firearm." In the end, the postconviction court summarily denied Mr. Vega's claim by simply adopting the state's argument against it.

I understand the Florida law governing the crime for which Mr. Vega was convicted to require proof that the weapon attributed to him was a deadly weapon. But the state failed to produce evidence sufficient to prove Mr. Vega's BB gun was a deadly weapon. The jury never heard, for example, whether the weapon was even operational. Neither did the jury have any opportunity to examine the weapon. Despite my concerns, I am aware that our Court must review the work of Florida's postconviction court under the deferential standard established by AEDPA. And under that standard, I cannot say that the postconviction court's decision was contrary to, or involved an unreasonable application of, clearly

25

established federal law, or that it resulted in a decision that was based on an unreasonable determination of the facts. For this reason, I concur in the result reached by the majority opinion. I write separately because I do not share the certainty expressed in the majority opinion that the postconviction court did the right thing. I would have preferred that Mr. Vega's ineffective assistance claim to get a closer look.

## I.

As the reader surely knows by now, Mr. Vega's appeal centers on his argument that trial counsel was ineffective for failing to move for JOA on the ground that the state did not put forward sufficient evidence that the BB gun used in the robbery was a deadly weapon.[1] I think the Florida postconviction court should have more closely scrutinized the performance of Mr. Vega's counsel on this issue.

Mr. Vega argues that the state's evidence was insufficient to prove the BB gun was a deadly weapon and that his counsel's performance was deficient because she failed to bring this problem to the court's attention by way of a motion for JOA. He says the jurors were required to find that he possessed a deadly

---

[1] As the reader also knows by now, in order to prove a claim of ineffective assistance of counsel, a person must show not only that his lawyer's performance was deficient, but also that the lawyer's poor performance had a bad effect or prejudiced him. I address Mr. Vega's argument about his lawyer's poor performance because his ineffective assistance claim turns on that prong.

weapon. Yet his jury was never even informed that Mr. Vega had only a BB gun. Because the only evidence the jury heard about the weapon was that it "'appeared' to be a real firearm," Mr. Vega says they were never equipped to consider the pertinent issue: whether the BB gun itself was actually deadly in this case.

Under Florida law, "the State is required to prove each and every element of the offense charged beyond a reasonable doubt to establish a prima facie case." Greenwade v. State, 124 So. 3d 215, 220 (Fla. 2013). "If the prosecution fails to meet this burden, the case should not be submitted to the jury, and a judgment of acquittal should be granted." Id.; see also Woodall v. State, 94 So. 3d 666, 668 (Fla. 5th DCA 2012) ("The State's failure to prove that the offense was committed in the manner charged may serve as grounds for a motion for a judgment of acquittal."). In this way, the purpose of a motion for judgment of acquittal is to test the legal sufficiency of the evidence presented by the State. State v. Lalor, 842 So. 2d 217, 219 (Fla. 5th DCA 2003). The inquiry thus becomes whether Mr. Vega's counsel could have—or should have—moved for JOA. This, of course, turns on Florida law.[2]

Mr. Vega was charged with robbery with a deadly weapon under Fla. Stat. § 812.13(2)(a). Section 812.13(2) says:

---

[2] I do not challenge the conclusion of the majority that a Florida court's interpretation of Florida law "does not conflict with or unreasonably apply any federal law." See Maj. Op. at 17. My difference is with the majority's interpretation of Florida law.

(2)(a) If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) If in the course of committing the robbery the offender carried a weapon, then the robbery is a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

A "deadly weapon" is a weapon "likely to produce death or great bodily injury." Dale v. State, 703 So. 2d 1045, 1047 (Fla. 1997) (quotation marks omitted). "Whether or not the weapon involved is to be classed as 'deadly' is a factual question to be resolved by the jury under appropriate instructions, id. (quotation marks omitted), "taking into consideration its size, shape, and material and the manner in which it was used," Lynn v. State, 567 So. 2d 1043, 1045 (Fla. 5th DCA 1990).

The State charged Mr. Vega with "carry[ing] a deadly weapon, to-wit: a BB gun or a handgun." At trial, the jury heard from Ms. Zoriano that Mr. Vega entered Jalapeno's "with a weapon in his hand." The State asked Ms. Zoriano whether Mr. Vega had a gun, and she said he did. She said he pointed the gun toward her and said "give me the money." She testified she was afraid Mr. Vega was going to shoot her because she believed the gun was real. Detective Brisinte testified he witnessed Mr. Vega go into Jalapeno's and "start[] pointing his gun at people." He agreed with the State's characterization that the weapon Mr. Vega

28

carried "appeared to be a firearm," it "appear[ed] to be a regular gun that shoot[s]

bullets."  In sum, and as the state said in closing, the only evidence introduced at

trial was that "there was a handgun."

> The jury was then instructed:

> If you find the defendant carried a deadly weapon described in the
> charge in the course of committing the robbery and that the deadly
> weapon described in the charge was a deadly weapon, you should find
> the defendant guilty of robbery with a deadly weapon.  If you find the
> defendant carried a weapon that was not a deadly weapon in the course
> of committing the robbery, you should find the defendant guilty of
> robbery with a weapon.  If you find that the defendant carried no
> firearm or weapon in the course of committing the robbery, but did
> commit the robbery, you should find the defendant guilty only of
> robbery.

The state court then defined "firearm," "deadly weapon," and "weapon."[3]

Mr. Vega's counsel did not argue that the evidence was insufficient to prove that

Vega had a deadly weapon.

The postconviction court denied Mr. Vega relief.  First, it found that "[t]he

only reason" the State did not charge Mr. Vega with robbery with a firearm was

because "he was caught with a BB gun 'replica' of a semiautomatic pistol when

committing a home invasion robbery three days later."  The postconviction court

---

[3] The court told the jury a "firearm" is "any weapon including a starter gun, which will, is designed to, or may be readily converted to expel a projectile by the action of any explosive, the frame or receiver of any such weapon, any firearm muffler or firearm silencer, any destructive device, or any machine gun. . . ."  The jury was also told that a "weapon" is "any object that could be used to cause death or inflict serious bodily harm."  Finally, the jury was instructed that a "weapon is a deadly weapon if it is used or threatened to be used in a way likely to produce death of great bodily."

said the prosecutor gave Mr. Vega "the benefit of the doubt and assumed that he had used the same replica in [the Jalapeno's] robbery." It then found Ms. Zoriano's and Detective Brisinte's trial testimony sufficient to convict Mr. Vega of robbery with a deadly weapon and recited that there is "no requirement that a firearm or a deadly weapon be introduced into evidence."

In this appeal, the state says "[w]hether the gun used to commit the robbery was a BB gun or a deadly weapon or a handgun, was not an issue at trial." To the contrary, I understand the jury was charged with deciding whether Mr. Vega used a deadly weapon. It therefore seems to me that the state's characterization of the weapon at trial, and the postconviction court's view of that characterization, matters.

Again, the postconviction court in Mr. Vega's case acknowledged that the actual weapon at issue was a "BB gun 'replica' of a semiautomatic pistol." Based on this fact, the court also acknowledged that Mr. Vega was not charged with robbery with a firearm. But as I've said, the jury never heard about the BB gun. The jurors heard only that Mr. Vega had a "gun" or a "firearm." On this record, the postconviction court summarily ruled that the testimony that the weapon "appeared to be a gun" was sufficient. So in Mr. Vega's case, the postconviction court engaged in a flawed process: it credited the state with charging Vega with a "BB gun 'replica' of a semiautomatic pistol," thereby recognizing the actual

30

weapon used, but then went on to find the testimony indicating that Vega possessed an entirely different type of weapon was sufficient to convict him of robbery with a deadly weapon.

Under Florida law, a gun is not necessarily a "firearm." Neskovski v. State, 568 So. 2d 468, 469 (Fla. 5th DCA 1990) (per curiam); see also id. at 469–70 (Goshorn, J., concurring) (explaining that there is a statutory definition that a "gun" must meet in order to qualify as a "firearm"). True too, a gun, a "firearm-looking weapon" (like a BB gun), or other weapon may qualify as a deadly weapon. See Dale, 703 So. 2d at 1047; Mitchell v. State, 274 So. 3d 1136, 1140 (Fla. 5th DCA 2019). However, this important distinction is fact-based, and is left to the jury to be answered "in each case." Dale, 703 So. 2d at 1047. The jury may certainly consider a victim's testimony about the defendant's words and actions— which may have implied the weapon was operational and capable of causing deadly injury—to support a finding that the weapon met a certain statutory definition under Florida law. See, e.g., Akins v. State, 838 So. 2d 637, 639 (Fla. 5th DCA 2003) ("[T]he victim's testimony that she thought the weapon was a sawed off shotgun, coupled with Akins's nonverbal implication that he would use it against the victim, sufficed to support a finding that Akins possessed a firearm during the robbery."). If that evidence is sufficient, a BB gun can be a deadly

31

weapon. I don't disagree with the majority's summary of Florida law on this topic, so far as it goes. See Maj. Op. at 18–21.

My concern is that the evidence introduced at Mr. Vega's trial did not allow the jury to make an informed decision about whether he used a deadly weapon. My review of Florida cases shows that in almost every case in which Florida courts have upheld the jury's finding that a weapon was a deadly weapon, the evidence consisted of some combination of the following: the weapon was introduced into evidence and jurors were able to view the weapon; jurors were given a description of the weapon; or the issue of whether the weapon was operational when it was used was introduced to the jury.[4] And in other cases like this one—in which it was

---

[4] See Dale, 703 So. 2d at 1046–47 (holding there was sufficient evidence to show a BB gun was a deadly weapon because the jury "view[ed] the weapon first-hand" (a fact of "key importance"), and officers testified about the gun's condition and showed the jury "in detail how the gun operated"); Gartner v. State, 118 So. 3d 273, 275, 277 (Fla. 5th DCA 2013) (holding there was sufficient evidence that a BB gun was a deadly weapon where witness identified the BB gun as the weapon used during the robbery, the BB gun was entered into evidence, and defense counsel raised the issue of whether the BB gun in evidence "was the exact weapon used"); Gayden v. State, 184 So. 3d 1203, 1204 & n.1 (Fla. 5th DCA 2016) (holding evidence of use of a deadly weapon as sufficient where the .380 mm handgun was described as a "handgun," and firearms technician testified the handgun was functional and there were several reasons why it failed to shoot a bullet when the trigger was pulled); Bunkley v. State, 882 So. 2d 890, 891 (Fla. 2004) (holding there was sufficient evidence that a "dangerous weapon" was used where witnesses testified the weapon was a "good sized buck knife," an officer testified that the knife was dangerous because it could be locked in the open position and the defendant admitted the knife could cut a throat, and jury could examine the knife for themselves); Lynn v. State, 567 So. 2d 1043, 1045 (Fla. 5th DCA 1990) (holding that evidence was sufficient to show that an air pellet pistol was a deadly weapon even though, when it was seized by police, it was inoperable, because it "was not unreasonable for the jury to infer that the pistol was loaded and operational" when the defendant used it in light of his threat to use it and witness testimony that the defendant went shopping for a CO2 cartridge for the pellet gun the morning of the robbery); see also Browne v. State, 239 So. 3d 171, 172–74 (Fla. 5th DCA 2018) (overturning conviction for robbery with a weapon when the record showed only that the barrel of the double-barreled

not clear whether the weapon was a firearm—defense counsel made a case that the weapon did not have the capacity to cause serious injury, affirmatively placing the "deadly weapon" issue before the jury.[5]

In Mr. Vega's case, the BB gun was not introduced as evidence. The jury never saw the weapon and only heard testimony describing it as a gun or firearm. The only testimony about how it operated came when Detective Brisinte agreed with the State's characterization that the weapon Mr. Vega carried "appear[ed] to be a regular gun that shoot[s] bullets."  But Mr. Vega's counsel never argued the weapon was not a gun and did not challenge whether it was deadly.  Nevertheless, the postconviction court never considered these nuances when it summarily denied Mr. Vega's ineffective assistance claim.  Instead, it adopted the state's apples-to-oranges comparison of the evidence the jury heard about the weapon—that it

---

shotgun was detached from the stock and firing mechanism, and the defendant pointed the barrel at the victim but did not use it as a club or bludgeon, meaning that there was not sufficient evidence the shotgun barrel was a "weapon" under Florida law); Brown v. State, 86 So. 3d 569, 570, 573–74 (Fla. 5th DCA 2012) (overturning conviction for aggravated battery with a deadly weapon when the only evidence in the record was that the defendant hit the victim with "two hollow, flimsy, plastic broomsticks," and "the jury did not have the ability to view the broomsticks to determine if they were of the size, shape, and material to cause serious injury").

[5] See Mitchell, 274 So. 3d at 1137–38, 1140 (upholding finding that the "firearm-looking weapon" was a deadly weapon where the defendant threatened to use it in a way to produce death or great bodily harm and defendant's counsel had the opportunity to expressly argue "'we don't know if it's a real gun or not' or 'if it was a gun'"); Davis v. State, 235 So. 3d 320, 321 (Fla. 2018) (upholding jury's finding that a "firearm or a BB gun replica of a firearm" was a weapon, not a deadly weapon).

appeared to be a firearm—with what the actual weapon was—"a BB gun 'replica' of a semiautomatic pistol."[6]

The state postconviction court missed an opportunity to take a closer look at Mr. Vega's claim and draw out these important nuances. Had it done so, it may have given Mr. Vega the chance he never received to develop his claim that he was convicted of a crime for which the state failed to prove all elements. I think he should have been given that chance.

---

[6] The postconviction court's order is almost a verbatim copy of the State's argument in response to Mr. Vega's postconviction motion.

34